## LEAVENWORTH COUNTY COMMISSIONERS *v.* CHICAGO, ROCK ISLAND AND PACIFIC RAILWAY COMPANY.

### APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE WESTERN DISTRICT OF MISSOURI.

No. 251. Argued April 3, 1890. — Decided April 14, 1890.

A consolidation of railroad companies in Missouri, under the act of Missouri of March 24, 1870, § 1, held valid.

A provision for the filing with the Secretary of State, by each of the consolidating companies, of a resolution accepting the provisions of the act, passed by a majority of the stockholders, at a meeting called for the purpose, was not observed, but its non-observance did not render the consolidation void.

The object of the statute was to prevent the consolidation of competing roads, and to confine it to roads forming a continuous line.

A certified copy from the office of the Secretary of State of the copy of the articles of consolidation filed there, under the statute, is conclusive evidence of the consolidation in every suit except one brought by the State to have the consolidation declared void.

A foreclosure of a mortgage on a railroad, and its sale under a decree, held valid, in a suit attacking them for fraud, because of the trust relations of the parties, when there was no collusion or fraud in fact.

IN EQUITY. Decree dismissing the bill. The plaintiffs appealed. The case is stated in the opinion.

Mr. *S. S. Gregory* and Mr. *J. M. Flower* (with whom was Mr. *D. K. Tenney* on the brief) for appellants.

Mr. *Thomas F. Withrow* (with whom was Mr. *M. A. Low* on the brief) for appellee.

MR. JUSTICE BLATCHFORD delivered the opinion of the court.

The bill in this case was filed in the Circuit Court of the United States for the Western District of Missouri, on the 25th of September, 1882, by the Board of County Commissioners of the County of Leavenworth, a municipal corporation of the State of Kansas, on behalf of itself and of all other stockholders of The Chicago and Southwestern Railway Company, chartered in Missouri, against The Chicago, Rock Island and Pacific Railway Company, an Illinois corporation, The Chicago and Southwestern Railway Company in Iowa, The Chicago and Southwestern Railway Company, (consolidated,) The Iowa Southern and Missouri Northern Railroad Company, the last-named three companies being Iowa corporations, The Chicago and Southwestern Railway Company, a Missouri corporation, David Dows and Frederick S. Winston, citizens of New York, and Calvin F. Burnes, a citizen of Missouri. The plaintiff sues as the owner of $300,000 out of $3,000,000 of the capital stock of The Platte City and Fort Des Moines Railroad Company, a Missouri corporation, which stock it originally subscribed for and paid for at par. The Circuit Court, held by Mr. Justice Miller, on a final hearing on pleadings and proofs, dismissed the bill, 25 Fed. Rep. 219, and the plaintiff has appealed.

The following are the material facts of the case, in the view we take of it, substantially as they are set forth in the opinion of Mr. Justice Miller, delivered in the Circuit Court: The Platte City and Fort Des Moines Railroad Company was created for the purpose of constructing and operating a railroad to commence at a point on the Missouri River opposite or nearly opposite the city of Leavenworth, Kansas, and run thence northeasterly to a point on the state line between Missouri and Iowa in the direction of Fort Des Moines. The name of the company was afterwards lawfully changed to the Leavenworth and Des Moines Railway Company, and later to the Chicago and Southwestern Railway Company. Such changes, however, were merely of name and without prejudice to the rights of stockholders in such original company. This company was also authorized by law to build a branch

road from some point on the main line to a point on the north line of Missouri in the direction of Ottumwa, Iowa.

On the 12th of May, 1869, a corporation was duly formed under the general laws of Iowa, and called the Chicago and Southwestern Railway Company in Iowa, for the purpose of building and operating a railroad from Washington, in Iowa, southwesterly, to meet the road of said Chicago and Southwestern Railway Company, chartered in Missouri, at the state line between Iowa and Missouri. The capital stock of this Iowa corporation was fixed in the articles of incorporation at $3,000,000, and it was provided in said articles " that in the event of the consolidation of this corporation with the Chicago and Southwestern Railway in Missouri, the company in which the two companies may be consolidated shall have the power to subject the said corporation to such amount of indebtedness or liability as the board of directors may deem necessary, not exceeding, however, six million of dollars."

On the 25th of September, 1869, these two companies adopted articles of consolidation and became one company under the name The Chicago and Southwestern Railway Company, for the purpose of building a railroad from some point on the Washington branch of the Chicago, Rock Island and Pacific Railroad, in the State of Iowa, to the Missouri River, in the State of Missouri, at a point on the Missouri River opposite or nearly opposite the city of Leavenworth, in the State of Kansas. In the proceedings which resulted in this act of consolidation the county of Leavenworth, as one of the stockholders in the Chicago and Southwestern Railway Company of Missouri, was represented by its duly appointed agent, who gave his assent to the consolidation.

On the 1st of October, 1869, six days after this consolidation, the new company entered into a contract with the Chicago, Rock Island and Pacific Railroad Company, whereby it agreed to issue its bonds to the amount of $5,000,000, payable thirty years after date, bearing interest at the rate of seven per cent per annum, for which coupons were to be attached to the bonds, the whole to be secured by a mortgage on its entire line of road to the Missouri River.

In consideration that the proceeds of those bonds should be placed in the hands of the Rock Island Company, and certain advantages be secured to that company by the contract, in the way of connection and running arrangements between the two companies and their roads, the Rock Island Company agreed to endorse those bonds, and out of the proceeds of their sale to pay the interest on all of them, until the new road was constructed and turned over to the Southwestern Company.

In pursuance of this agreement the Southwestern Company issued its bonds to the amount of $5,000,000, and placed them in the possession of the Rock Island Company; and on the 6th of October, 1889, made and delivered to the defendants Dows, Winston, and Burnes, a deed of trust upon their entire line of road from the Missouri River, in Missouri, to a point on the Washington Branch of the Chicago, Rock Island and Pacific Railroad in Iowa, to secure the payment of the bonds and interest, as agreed. The Rock Island Company endorsed the bonds and sold them in open market, or paid them, with its guaranty on them, to the contractors who built the road.

On the 16th of August, 1871, articles of consolidation were signed between the Chicago and Southwestern Railway Company of the States of Missouri and Iowa and another company organized under the laws of the State of Missouri, by the name of the Atchison Branch of the Chicago and Southwestern Railway Company, which was authorized to construct a road from a point on the east bank of the Missouri River opposite the city of Atchison, in the State of Kansas, by the most practicable route, to a junction with the Chicago and Southwestern Railway. These articles of consolidation were duly filed in the office of the Secretary of State of the State of Missouri according to the law of that State. The validity of that consolidation is assailed by the plaintiff on the ground that it is void by reason of a failure to conform to the laws of Missouri.

The original bill prays for the appointment of a receiver to take possession of the railroad operated by the Chicago, Rock Island and Pacific Railway Company, extending from Washington in Iowa to the Missouri River, and for a decree declar-

ing the articles of consolidation between the Chicago and Southwestern Railway Company, chartered in Missouri, and the Chicago and Southwestern Railway Company in Iowa, to be void; that those companies and the stockholders of each be remitted to their rights as existing before such attempted consolidation; that the $5,000,000 of bonds and their coupons, and the trust deed securing them, be decreed to be void as a lien upon the road; that the trust deed be cancelled by the trustees, as a cloud upon the title; that all payments of interest made on those bonds by the Rock Island Company or for such consolidated company, on any account whatever, be adjudged to have been voluntary and unauthorized; that it be declared that no right of action ever existed for the reimbursement thereof; that the proceedings for the foreclosure, hereinafter mentioned, of the trust deed, be decreed to have been and to be collusive, fictitious, and fraudulent; that the decree therein, the sale thereunder, the personal judgment against the consolidated company, and all other proceedings had under such decree be held to be fraudulent and void; that the organization of the Iowa Southern and Missouri Northern Railroad Company, hereinafter mentioned, the consolidation of the last-named company with the Chicago, Rock Island and Pacific Railway Company, and all acts done by either in execution or confirmation thereof, be adjudged to be void; that an accounting be had between the plaintiff and the Southwestern Railway Company, chartered in Missouri, on the one part, and the other defendants charged as trustees, on the other part, as to all proceedings had by either, involving the receipt or lawful disbursement of money, in which the plaintiff or the Chicago and Southwestern Railway Company, chartered in Missouri, had or have any interest, as well as for the use and occupation of the road and franchises of the latter company; that the true balance be ascertained, and the parties from whom and to whom payable; that, if the balance should be found due to the plaintiff or to the latter company, a decree be given for its recovery against the party indebted, and, if the balance be found against the plaintiff or that company, the plaintiff or it be decreed to pay the same, which the plaintiff offers to do;

that the line of railroad running from the Missouri River, opposite or nearly opposite the city of Leavenworth in Kansas, by way of Cameron, to the state line between Iowa and Missouri, be decreed to belong to the Chicago and Southwestern Railway Company, chartered in Missouri ; that the same be delivered up to that company, free and discharged of all liens; and that that company and the plaintiff be re-established in all the rights, properties, and franchises of that line of railroad ; and for general relief.

The Chicago, Rock Island and Pacific Railway Company answered the bill, and Dows and Winston, trustees, also answered it, those answers being filed on the 5th of March, 1883. On the 30th of March, 1883, the plaintiff filed exceptions to the first answer, and on the 2d of April, 1883, exceptions to the second answer. These exceptions were heard by the court, held by Judges McCrary and Krekel, and were overruled. The opinion of the court, delivered by Judge McCrary, is reported in 18 Fed. Rep. 209. The conclusion of the court was, that the articles of consolidation between the Chicago and Southwestern Railway Company in Missouri and the Iowa corporation of the same name, having been entered into on the 25th of September, 1869, and the bill not having been filed until the 25th of September, 1882, and a case of concealed fraud not being shown, the defences of laches and of a bar under the Statute of Limitations of Missouri, set up in the answers, must be sustained.

On the 16th of February, 1884, the plaintiff filed an amended bill, with substantially the same prayers as those of the original bill.

To resume the history of the road, it was completed after several years, and the money with which this was done was mainly raised by the sale of the bonds of the Southwestern Company, endorsed by the Rock Island Company, and the Rock Island Company paid the interest on the bonds, as it had assumed to do. The possession of the road, as it became fit for use, was taken by the Rock Island Company, so that, when it was completed from one end to the other, it was in the possession and use of that company and so remained for

two or three years afterwards. The Rock Island Company says, in its answer, that it paid the interest on the bonds out of the sale of the bonds themselves, according to the contract, until the road was finished, and after that paid it out of its own money, by reason of its obligation as guarantor or endorser of the bonds. After interest had thus accrued and been paid in this latter mode to the amount of $1,000,000, according to its statement, it made application to the trustees in the deed of trust for a foreclosure, under the provisions of that deed, on account of the default of the Southwestern Company in paying such interest. The trustees accordingly brought such a suit in the Circuit Court of the United States for the District of Iowa where a decree was rendered. A sale of the Southwestern road was made to a corporation organized under the laws of Iowa for its purchase. Under that sale a deed was made to that company by the Chicago and Southwestern Railway Company, by order of the court, and the deed and sale were confirmed. To that suit of foreclosure the Chicago and Southwestern Railway Company and the Chicago, Rock Island and Pacific Railway Company and others were made defendants, and the two companies appeared by counsel.

After the second consolidation, in which the Atchison Branch came into the Southwestern Company, that company issued bonds to raise money for the construction of this Atchison Branch, and a mortgage or deed of trust was made to secure the payment of those bonds, which was a first mortgage on the Atchison Branch and a second mortgage on the remainder of the consolidated company's road. The trustees in that mortgage were made defendants in the foreclosure suit, and the holders of the bonds so secured were afterwards, on motion, admitted to defend for their interest in the suit.

After the sale of the road under the decree, and its purchase by the new organization, which was called the Iowa Southern and Missouri Northern Railroad Company, that company entered into a consolidation with the Chicago, Rock Island and Pacific Company, which consolidation included other roads, or pieces of roads, built under the auspices of the Rock Island Company, all of which were now consolidated under

the name of the Chicago, Rock Island and Pacific Railway Company, which is the principal defendant in this suit.

This suit of the county of Leavenworth is founded on the proposition that the attempted consolidation of the Chicago and Southwestern Company with the Atchison Branch Company is utterly void, and that, as the real Southwestern Company, which issued the bonds and made the mortgage on which the foreclosure suit and sale were based, was never served with process or appeared in that suit, that decree and foreclosure sale are also void. As the real Southwestern Company, which gave this mortgage, refuses to take any steps to assert its rights, the county of Leavenworth, as one of its stockholders, comes forward, on behalf of itself and other stockholders, to do so, and prays that the decree and sale under the proceedings in the Iowa Circuit Court be set aside and held for naught, as well as the pretended second consolidation. Should this second consolidation be held valid, then it asks that the sale of the road under that decree, and the decree itself, be set aside and held for naught, on the ground of fraud and abuse of trust by the Rock Island Company.

The first question considered by the Circuit Court was, whether the consolidation with the Atchison Branch was so void that no company formed by such consolidation had an existence making it capable of doing any business, and especially of being a defendant in the suit to foreclose the mortgage for $5,000,000. The court said: "It is obvious that if this second consolidated company was not the legal owner of the Chicago and Southwestern Railroad, and was not liable for the bonds and mortgage, then no company was before the court which foreclosed that mortgage, which had any interest in the road, or was under any obligation to defend the suit. As we have already stated that the first consolidated company was not before that court at all, nor represented in the proceedings, except as it was a part of the second consolidated company, it would therefore follow that the foreclosure proceedings are void as to the real Chicago and Southwestern Company; the sale of its road is void, and the consolidation with the Chicago and Rock Island, as transferring the owner-

ship of that road, is ineffectual; and the real Southwestern Company, under the first consolidation, is still in existence, is the legal owner of the road, and has a right to pay the overdue interest on its bonds, and to take possession of it."

The consolidation took place in Missouri under an act of that State approved March 24, 1870, (Laws of 25th General Assembly, adjourned session, p. 89,) the first section of which is as follows: "Section 1. Any two or more railroad companies in this State, existing under either general or special laws, and owning railroads constructed wholly or in part, which, when completed and connected, will form in the whole or in the main one continuous line of railroad, are hereby authorized to consolidate in the whole or in the main, and form one company owning and controlling such continuous line of road, with all the powers, rights, privileges, and immunities, and subject to all the obligations and liabilities to the State, or otherwise, which belonged to or rested upon either of the companies making such consolidation. In order to accomplish such consolidation, the companies interested may enter into contract fixing the terms and conditions thereof, which shall first be ratified and approved by a majority in interest of all the stock held in each company or road proposing to consolidate, at a meeting of the stockholders regularly called for the purpose or by the approval, in writing, of the persons or parties holding and representing a majority of such stock. A certified copy of such articles of agreement, with the corporate name to be assumed by the new company, shall be filed with the secretary of State, when the consolidation shall be considered duly consummated, and a certified copy from the office of the secretary of State shall be deemed conclusive evidence thereof. The board of directors of the several companies may then proceed to carry out such contract according to its provisions, calling in the certificates of stock then outstanding in the several companies or roads, and issuing certificates of stock in the new consolidated company under such corporate name as may have been adopted: *provided, however*, that the foregoing provisions of this section shall not be construed to authorize the consolida-

tion of any railroad companies or roads, except when by such consolidation a continuous line of road is secured, running in the whole or in the main in the same general direction; *and provided,* it shall not be lawful for said roads to consolidate in the whole or in part, when by so doing it will deprive the public of the benefit of competition between said roads. And in case any such railroad companies shall consolidate or attempt to consolidate their roads contrary to the provisions of this act, such consolidation shall be void, and any person or party aggrieved, whether stockholders or not, may bring action against them in the Circuit Court of any county through which such road may pass, which court shall have jurisdiction in the case and power to restrain by injunction or otherwise. And in case any railroad in this State shall hereafter intersect any such consolidated road, said road or roads shall have the right to run their freight cars without breaking bulk upon said consolidated road, and such consolidated road shall transact the business of said intersecting or connecting road or roads on fair and reasonable terms, and the same may be enforced by appropriate legislation. Before any railroad companies shall consolidate their roads, under the provisions of this act, they shall each file with the secretary of State a resolution accepting the provisions thereof, to be signed by their respective presidents and attested by their respective secretaries, under the seal of their respective companies, which resolution shall have been passed by a majority vote of the stock of each at a meeting of the stockholders thereof, to be called for the purpose of considering the same."

The Circuit Court, after quoting this section of the statute, proceeds to say: " A certified copy of the articles of agreement under which the consolidation was effected, with the corporate name of the new company, was duly filed with the secretary of State, as this law requires. But there is no evidence in this record of the filing with the secretary of State, by each of the companies so consolidated, of a resolution accepting the provisions of the act, passed by a majority of the stockholders, at a meeting of stockholders called for the purpose of considering the same, nor is there any evidence of such

meeting of the stockholders of the companies separately, except such as may be implied from the certified copy of the articles of agreement of consolidation duly filed in the secretary's office. Is the absence of any evidence of these meetings and of the passage of the resolutions to accept the provisions of the act by the respective companies fatal to the creation of the new consolidated company, when all other requirements of the statute shall have been complied with? It will be observed that this is the last provision in the statute, though the thing ordered to be done is one of the first steps required in the process. It is also a provision which may well be held to be directory, and designed to secure evidence that each of the companies intending to consolidate recognized the statute as the sole authority for such consolidation, and their obligation to be governed by its provisions. If the other essential provisions of the act were complied with, it does not necessarily follow that the whole proceeding would be void for a failure to comply with this direction of the act. It is argued, however, that by the express language of the statute it is declared that, ' in case any such railroad companies shall consolidate or attempt to consolidate their roads contrary to the provisions of this act, such consolidation shall be void, and any person or party aggrieved, whether stockholders or not, may bring action against them in the circuit court of any county through which such road may pass, which court shall have jurisdiction in the case and power to restrain by injunction or otherwise.' This sentence does not come after but before the provision concerning the resolution accepting the law under which consolidation is made. In the orderly succession of ideas, this concerning the accepting the provisions of the statute was not in the mind of the draftsman when the provision making the consolidation void was penned. On the other hand, the limitation that the companies which are authorized to consolidate are only those whose roads when united ' will form in the whole or in the main one continuous line of railroad,' and that this authority ' shall not be construed to authorize the consolidation of any railroad companies or roads, except when by such consolida-

tion a continuous line of road is secured, running in the whole
or in the main in the same general direction,' and 'it shall not
be lawful for said roads to consolidate in the whole or in part,
when by doing so it will deprive the public of the benefit of
competition between said roads,' immediately precedes the
declaration that any attempt to consolidate contrary to the
provisions of the act shall be void. It is the consolidation of
such roads as do not form when so consolidated one continu-
ous line, but may be made up of parallel and competing lines,
which is forbidden and declared to be void. The language of
the remedy prescribed by the statute indicates that it is for the
violation of this principle that it is given. The court of the
county in which the road lies or through which it passes, not
that where the company has its organization or offices, shall
have jurisdiction, and the remedy shall be to restrain the com-
pany by injunction or otherwise. It is the continuity or par-
allelism of the roads, the benefit of competition by roads
between the same points, which is to be secured. And it is
clear that the legislature was not so much interested about
the companies and their amalgamation into one company as
they were that rival roads and competing roads should not be
consolidated and brought under the same control. I doubt
very much whether the legislature intended to declare that
even for a violation of this principle, much less of any of the
other mere details of the mode of accomplishing this consoli-
dation, it should be absolutely void, void *ab initio*, void any-
where and under all circumstances, but only, as the word
'void' is so often used in legislation and in written agree-
ments, that it should be voidable; that if on investigation the
roads were of that character which the statute forbids to be
consolidated, the proper court could so declare and annul and
avoid the consolidation. This is the more reasonable, as the
parallelism or competing character of the two roads, if it were
disputed, could only be satisfactorily ascertained by a judicial
investigation, and it could not be permitted that any man
who wished to do so could assume for himself that the consol-
idation was void and act accordingly. Without the aid of the
statute, if the legislature or the governor or the attorney-gen-

eral of the State believed the roads were not such as the law permitted to be consolidated, they could, by the institution of proper proceedings in a court of justice, have the act of consolidation annulled, if they were correct in their views. This statute confers the right on any person aggrieved by such improper consolidation to have relief by application to the proper court, which would not otherwise exist.

"In regard to the acceptance of the provisions of the consolidation act to be filed with the secretary of State, this is eminently a matter between the State and the corporations whose rights are affected, and if, on a failure to file such acceptance, the consolidation is to become void, it is the privilege of the State to enforce the forfeiture or annulment, and not of every private person who shows an injustice or injury done to himself. But if this was more doubtful than it is, it appears to me that the proposition here insisted on is concluded by this language of the act : 'A certified copy of such articles of agreement [for consolidation], with the corporate name to be assumed by the new company, shall be filed with the secretary of State, when the consolidation shall be considered duly consummated, and a certified copy from the office of the secretary of State shall be deemed conclusive evidence thereof.' This certified copy from the secretary's office is to be considered evidence of something. Let us consider what and its effect as evidence. 1. Of what is it to be a copy? Of the articles of agreement for consolidation made by the companies to be consolidated; not of all the requirements of the statute, preliminary or otherwise. 2. What shall it prove? That thereafter the consolidation shall be considered duly consummated. There is no ambiguity in this. It shall be evidence that the consolidation has been perfected, and has resulted in the creation of a new corporation, whose name is to be found in this certified copy. 3. What is the effect of this evidence? The statute says it shall be conclusive. It is not necessary here to hold that, in a direct proceeding on the part of the State to have a declaration of the nullity of such a consolidation, no evidence can be received to impeach the validity of the original act of consolidation. It is my opinion that in such case

the certified copy from the secretary's office would not be con-clusive, but *prima facie*, evidence.

" But what is meant and what is reasonable is, that when a corporation so organized comes into a court of justice, either as plaintiff or defendant in a contest with individuals or other corporations in regard to any matter affecting its rights, its powers, its authority to make contracts, to sue or to be sued, the production of the paper mentioned shall end all inquiry into its existence as a corporation, with such powers as the law confers on it. It would be burdensome in the extreme, a hardship altogether unnecessary to any proper purpose, to require of a corporation doing an immense business to prove, in every controversy it may have growing out of that business, that all the steps which the law directs for the consolidation proceedings have been strictly complied with. The hardship would be as great on those who sue it for violated duty of contract, or otherwise, to be required to prove in the same manner the existence of the corporation which they bring into court.

" The question of the existence of this corporation arises incidentally in this effort of the county of Leavenworth to assert the rights of another company, and, though the bill prays that the consolidation be held void, it is not the State which makes this request or institutes or controls this proceed-ing, nor is the proceeding itself of the character of a direct suit for the purpose of procuring such a decree, which would bind the company in any other case.

" I am of the opinion that the consolidation of August, 1871, was valid, and that this corporation thus formed suc-ceeded to the rights, the property, and the obligations of the Chicago and Southwestern Company created by the consoli-dation of September, 1869, and that it was the proper party to be sued and to represent all the interests of all the stock-holders in all the corporations of which it was composed, including the county of Leavenworth as one of these stock-holders."

We have carefully considered the views urged on the part of the appellant, in regard to the propositions thus laid down

by the Circuit Court, and are of opinion that those propositions are sound; and it is sufficient for us to express our concurrence in them, without adding more.

The Circuit Court, in its opinion, next discusses the question of the validity of the proceedings in the Circuit Court of the United States for the District of Iowa, under which the road of the Southwestern Company was sold, and afterwards became a part of the new system of consolidated roads held by the Rock Island Company, and says: "The matter is much simplified by the fact that that court had jurisdiction of the case, jurisdiction of the parties plaintiff and defendant, of all the necessary parties to the relief sought, and of the subject matter of the suit. For any mere error of that court in its decision on matters of law or fact, the proper remedy was by appeal, and one of the parties did, as to its own interest, take such appeal to the Supreme Court of the United States, which affirmed the decree. Another remedy was by bill of review asking the same court to reconsider and reverse or modify its decree on the same or on newly discovered evidence. This course has not been adopted, and it admits of very serious doubt whether any proceeding can be sustained in any other court the purpose of which is to set aside the decree of that court in the matter, of which it had jurisdiction. I know of no reason why the suit to have a decree declaring null and void the foreclosure proceedings of that court, by reason of any fraud in its procurement, whether it be legal fraud implied from the relations of the parties, or actual fraud practised in the progress of the case, should not have been brought in the court where these proceedings were had.

"Conceding, however, the jurisdiction of this court — the Circuit Court for the Western District of Missouri — to grant some form of relief inconsistent with the binding efficacy of the decrees of the Circuit Court for the District of Iowa, let us inquire on what grounds the efficacy of those decrees is denied. Although in the more enlarged use of the word it may be said the grounds are all founded on fraud, they present in reality two distinct propositions, namely:

"(1) That such were the relations of the trustees in the

mortgage to the Chicago, Rock Island and Pacific Company, at whose instance the mortgage was foreclosed, and the relations of those trustees and the governing officers of the Rock Island Company to the debtor, the Southwestern Company, and the relations of the officers of both these companies to each other and to both of these companies, that there could be no just and rightful foreclosure as between these parties, and that the action of the trustees in the mortgage deed and of the Rock Island Company, as moved by its officers, in promoting the foreclosure, was a violation of the trust reposed in all these parties, for the breach of which the whole proceeding must be held void."

By a statement in the brief of the counsel for the appellant, showing the shares of the stock and the stockholders of the Chicago and Southwestern Railway Company, as voted at the meetings of the stockholders from 1869 to 1876 inclusive, and a list of its officers and directors during the same period, the following appears:

At the first meeting of the stockholders of the consolidated company, in 1869, there were present 10,396 shares, being those held in the original constituent companies. Of these shares, Leavenworth County voted 3000, the East Leavenworth Improvement Association 5000, four officers and directors of the Rock Island Company 10 each, and the remaining shares were held by various individuals in small amounts. Thirteen directors were elected at that meeting, of whom five were officers or directors of the Rock Island Railroad Company, one of such five being its general solicitor.

No meeting of the stockholders was held in 1870. In 1871, at the stockholders' meeting, 67,500 shares were voted, of which 25,000 were voted by such general solicitor, and 25,000 by another person connected with the Rock Island Company. Of the directory of thirteen persons, nine were officers or directors of the Rock Island Company. Two of the five officers of the road, namely, the treasurer and transfer agent and the general solicitor, were connected with the Rock Island Company; and of the executive committee of five, three were officers of the latter company.

At the stockholders' meeting in 1872, 88,719 shares were voted, of which 60,933 were voted by persons connected with the Rock Island Company; and on the day after such meeting 68,247 shares of the stock of the Southwestern Company were transferred to the president of the Rock Island Company, who was also a director of the Southwestern Company. In 1872, nine out of the thirteen directors of the Southwestern Company, including the president and the treasurer, were representatives of the Rock Island Company, as were also three out of the five members of the executive committee.

In 1873, 77,284 shares were voted, of which 68,250 were voted by persons connected with the Rock Island Company, all of the shares so voted, except 1505, being represented by the solicitor of the Rock Island Company. Of the board of directors of the Southwestern Company during 1872, nine of the thirteen were officers or directors or employés of the Rock Island Company.

At the stockholders' meeting in 1874, 74,628 shares were voted, of which all except 504 were voted by representatives of the Rock Island Company.

At the stockholders' meeting in 1875, 75,781 shares were voted, all of which were voted by representatives of the Rock Island Company.

At the stockholders' meeting in 1876, 76,788 shares were voted, all but 505 of which were voted by the general solicitor of the Rock Island Company, as proxy.

At the subsequent meetings of the stockholders, held down to 1880, 68,246 shares were voted in the interest of the Rock Island Company. It does not appear by the records that there has been any meeting of the board of directors of the Southwestern Company, or any election of officers of the company other than directors, since 1876.

This state of things is summed up thus in the opinion of the Circuit Court: "It must be admitted that the case made is a very strong one. One of the trustees of the mortgage deed was a director in the Rock Island Company; both the others were stockholders in it. The president of the Rock Island Company was president of the Southwestern Company. A

majority of the directors of the Southwestern Company were directors in the Rock Island Company. There was in the hands of the president of the Rock Island Company a majority of the stock of the Southwestern Company. The attorney who appeared and represented the Southwestern Company had been previously in the employ of the Rock Island Company, and the attorneys who brought the foreclosure suit in the name of the trustees were afterwards, in many matters, attorneys for the Rock Island Company, and one of the attorneys of the Rock Island Company in the foreclosure suit, was at the time a director in the Southwestern Company."

On these facts the Circuit Court remarks as follows : " As regards the attorneys it can hardly be admitted as an impeachment of the attorney of the defendant, the Southwestern Company, that he had been or was afterwards an attorney of the Rock Island Company, nor will it be presumed that if he was even then in the employment of the Rock Island Company in other matters he did not or would not faithfully represent the Southwestern Company in this matter ; and his character repels any such inference. Nor does the fact that the attorney of the Rock Island Company was a director in the Southwestern Company, though the interest of the two companies might conflict, preclude him from acting as attorney for the former company, and we see no reason why the men then and afterwards attorneys for the Rock Island Company should not represent the trustees in the mortgage as there was no conflict of interest between the trustees and the Rock Island Company. In reference to the relations of the officers of the two companies to those companies and to each other, it is quite apparent, from the consolidation of the Iowa and the Missouri companies on the 26th of September, 1869, and the contract between this consolidated company and the Rock Island on the 1st day of October, that the purpose of the Rock Island Company, or of those who had its control, was to secure and retain a paramount influence in the directory of the Chicago and Southwestern ; and in point of fact it cannot be doubted that it did obtain and exercise at times such control. While it is not necessary to

consider that the purpose of this contract was to injure the Southwestern Company, but in the view of all the parties it was to advance the interest of both companies, it is certainly true that the primary object in the minds of those controlling the Rock Island Company was to make the other road a subsidiary and feeding road to its own line. This purpose was not necessarily a bad one, and was or might have been consistent with the best interests of both companies. The Rock Island Company paid a valuable consideration for this control and the other company received it. It endorsed the bonds of the Southwestern Company to the amount of $5,000,000 and agreed to protect it against a foreclosure of the mortgage given to secure the payment of these bonds during the period of construction of the road. The burden of this obligation and its importance to the success of the undeveloped enterprises of the new company cannot be easily overrated. The road could not have been built without it. The money for the construction of the track and laying it with iron came almost exclusively from the sale of these bonds, and that the money was raised on them was due, not to the credit of the Southwestern Company or to the mortgage on a road barely begun, but to the endorsement of the Rock Island Company and the credit which that endorsement gave to the bonds. This credit and assumption of liability by the Rock Island Company enabled the Southwestern Company to build its road to completion. There was nothing, therefore, fraudulent or oppressive in that company's seeking to retain such control of the road as would enable it to realize the consideration for which it assumed this obligation of $5,000,000. Matters were in this condition when the road was completed, but the Southwestern Company had no means of equipping its road with rolling stock and meeting other necessary outlays. The Rock Island Company furnished this, and used the road under an arrangement for lease, never, perhaps, fully consummated. But at the end of two or three years, in which it kept an account of receipts and expenditures, it was found that the Southwestern Company was indebted over a million of dollars for repairs and construction of the road, and had defaulted in payment

of the interest on its bonds to an amount nearly equal, the coupons for which had been paid by the Rock Island Company as endorser, and were held by it. That company determined then to assert the right which its contract gave to have the mortgage foreclosed to satisfy the interest which it had paid on the bonds it had endorsed. Unless there was some injustice in the manner in which it had managed the road or kept its accounts, I see no defect in its right to insist on the foreclosure. If the Rock Island Company had a right to insist on this foreclosure, it was the duty of the trustees in the deed of trust to bring the suit for that purpose. I am unable to see anything in the fact that some of the same men were found to be trustees in this deed and directors in the Rock Island Company, and that directors in the Southwestern Company were also directors in the Rock Island Company, which should block the course of justice, paralyze the power of the court, and deprive the creditor corporation of all remedy for the enforcement of its lien. If it could be shown that the Southwestern Company did not owe this interest, or that the Rock Island Company had in its hands the means of the Southwestern Company to meet this obligation, and that by reason of collusion between those who controlled both companies this fact was suppressed or concealed, it would present a strong case for relief. But this would be actual fraud, and one not necessarily growing out of the influence of the Rock Island directory over that of the Southwestern. Notwithstanding this commingling of officers, the corporations were distinct corporations. They had a right to make contracts with each other in their corporate capacities, and they could sue and be sued by each other in regard to these contracts; and the question is not could they do these things, but have the relations of the parties — the trust relations, if indeed such existed — been abused to the serious injury of the Southwestern Company. In regard to the legal right of the Rock Island Company to have the mortgage foreclosed in satisfaction of the sum paid by it for interest after the completion of the road, it seems to me there can be no reasonable doubt."

The counsel for the appellant, in his brief, after urging the

propositions that the plaintiff is entitled to bring and maintain this suit for the relief prayed, contends that, by reason of the trust relations existing between the Rock Island and the South-western Companies, quite aside from any proof of actual fraud or damage, the decree of foreclosure is no bar to the accounting and relief sought by the bill in this case. To support this proposition the cases are cited of *Davoue* v. *Fanning*, 2 Johns. Ch. 252; *Michoud* v. *Girod*, 4 How. 503; *Koehler* v. *Black River Falls Iron Co.*, 2 Black, 715; *Drury* v. *Cross*, 7 Wall. 299; *Marsh* v. *Whitmore*, 21 Wall. 178, 183, 184; *Jackson* v. *Ludeling*, 21 Wall. 616; *Twin Lick Oil Co.* v. *Marbury*, 91 U. S. 587; *Wardell* v. *Railroad Co.*, 103 U. S. 651; *Thomas* v. *Railroad Co.*, 109 U. S. 522; *Allen* v. *Gillette*, 127 U. S. 589; *Benson* v. *Heathorn*, 1 Younge & Coll. 326; *Aberdeen Railway Co.* v. *Blakie*, 1 Macqueen, H. L. 461; *Lydney &c. Co.* v. *Bird*, 55 Law Times, N. S. 558; *Hoyle* v. *Plattsburgh & Montreal Railroad Co.*, 54 N. Y. 314; and other cases.

But, notwithstanding the general principle laid down in the cases cited, we concur in the views thus taken of the present case by the Circuit Court, and place our decision as to this branch of it on the same grounds.

The next proposition considered by the Circuit Court is as to whether there was any actual fraud perpetrated in the progress of the foreclosure suit, to the prejudice of the present plaintiff.

On that question, the Circuit Court says in its opinion: "The principal ground of complaint under this head is, that the Rock Island Company, being in actual possession and use of the road on which the mortgage was a lien, should have used its revenue first to pay the interest and have postponed the repairs and construction to that purpose. The proper place to have made this defence was in the foreclosure suit. Though it may be said that the Southwestern Company made no such defence because it was in the control of the Rock Island Company directory, which is plausible if not sound, it is to be observed that this suit was in the court for more than a year; that it is hardly possible that the authorities of the county of Leavenworth did not know of its pendency and who

were the directors in its own company, and if it had at any time appeared in that court and sought to make the defence it now sets up it would have been permitted to do so. Such defence, including also the correctness of the accounts of the Rock Island Company, was made by a Mr. Mueller, representative of the bondholders under the second mortgage made to obtain money to build the Atchison Branch. On his motion he was made defendant and permitted to file a cross-bill. The claim of the Rock Island Company for the interest paid by it as endorser, its claim for expenditures in repairs and construction, and the correctness of its accounts and its appropriation of the receipts from the Southwestern road, were all assailed by him in a cross-bill and referred to a master, before whom his counsel appeared and to whose report he excepted. This report was confirmed and became the basis of the decree as to the amount due the Rock Island Company under the mortgage, and of a personal judgment for repairs and construction. From this decree Mueller took an appeal to the Supreme Court of the United States, where the decree was affirmed. But I must add that even now, after all the proofs taken in the present case, I do not see that, if the county of Leavenworth had been a party to that suit, or if the counsel for the Southwestern Company had been ever so anxious to prevent a foreclosure, what defence he could have successfully presented, or how he could have diminished the amount which the court found to be due from that company on the mortgage. The case is one not uncommon of a road completed which in its first years did not earn enough money to pay its running expenses, its necessary repairs, and the interest on its bonded debt. Such roads have often been sold out under foreclosure proceedings, and passing into other hands have become successful and profitable enterprises. The original owners see then, when it is too late, that they permitted a valuable property to pass from them which they would gladly reclaim. But courts of equity do not sit to restore opportunities or renew possibilities which have been permitted to pass by the neglect, the ignorance, or even the want of means of those to whom they were once presented. It follows from these views, without reference to many other

matters presented for consideration, that the plaintiff is not entitled to the relief it asks or to any relief founded on this bill. It must, therefore, be dismissed, and it is so ordered."

On the question thus considered the counsel for the appellant cites the cases of *United States* v. *Throckmorton,* 98 U. S. 61, and *Pacific Railroad of Missouri* v. *Missouri Pacific Railway,* 111 U. S. 505. But we concur in the views of the Circuit Court, and are of opinion that it is not shown that the decree in the foreclosure suit was procured by fraud or collusion. It would serve no good purpose to examine in detail the testimony bearing on this subject.

These conclusions make it unnecessary to consider the defences of the statute of limitations and of laches, as urged by the appellees.

The decree of the Circuit Court is                    *Affirmed.*

MR. CHIEF JUSTICE FULLER and MR. JUSTICE BREWER did not sit in this case or take any part in its decision.