## LYMAN v. KANSAS CITY & A. R. CO. et al.

### (Circuit Court, W. D. Missouri. May 7, 1900.)

**1. MORTGAGES—RELEASE—STATUTORY REQUIREMENTS.**

The Missouri statute (Laws 1897, p. 3) which provides that the recorder of deeds shall require the releasor of a mortgage to present for cancellation the notes secured, or make affidavit of their loss, if applicable in any case to a mortgage securing railroad bonds, cannot be given a retrospective effect, so as to render invalid the release of such a mortgage previously executed, where such release was made in accordance with the express provisions of the mortgage itself.

**2. RAILROADS—CONDITIONS OF MORTGAGE—ESTOPPEL OF BONDHOLDER BY ACQUIESCENCE.**

The several creditors of a debtor, holding security on separate properties, among which was an unfinished line of railroad, united in a general scheme of reorganization, and organized a corporation to buy in the several properties at foreclosure sale, and hold the same in trust for the benefit of all. In accordance with further plans, the several creditors executed proxies or powers of attorney to the trustee, authorizing it to form a railroad company to take the properties, and to issue stock and first and second mortgage bonds, to be apportioned among the creditors in final settlement of their claims against the trust property. The plan as then outlined contemplated that, on default in payment of interest on the second mortgage bonds, control of the property of the railroad company should be given to the holders of such bonds, who should manage the same until it was in a condition to meet future payments; but the proxies expressly authorized and ratified any modification of the plan which the directors of the trustee corporation should deem advisable, and in the exercise of such authority the trustee modified the plan by providing in the second mortgage, which was by reference made a part of each bond, that on default in payment of interest the stock of the railroad company should be transferred unconditionally to the trustee named in the mortgage, for the pro rata benefit of the holders of the second mortgage bonds, and the mortgage should then be canceled. *Held*, that such modification was within the authority granted, but that, even if in excess of such authority, a single creditor, holding less than 2 per cent. of the indebtedness, who accepted the bonds allotted to him thereunder, and retained them without objection for more than four years, and until after a default had occurred, the stock had been transferred, and the mortgage canceled by the trustee, could not then maintain a suit in equity to reinstate the mortgage, and eliminate such provision therefrom, as having been inserted without authority.

**3. STATEMENTS OF COUNSEL—EFFECT.**

Statements made by counsel at the trial bind the client as effectually as if made in the formal pleading.

**4. CONTRACT—CONSTRUCTION.**

There is no safer rule for the construction of written instruments than that placed upon them by the parties thereto before any controversy arose between them.

5. RAILROAD MORTGAGE—BONDHOLDERS.

Each bondholder, as in a mortgaged railroad, sustains a contractual relation to every other bondholder, so that, in dealing with the common security, he cannot pursue a wholly selfish course, prejudicial to the interests of the community in interest.

This was a suit in equity by a holder of bonds of the defendant railroad company to set aside a release of the mortgage securing the same, made by the trustee in accordance with the terms of the mortgage.

C. H. Nearing, for complainant.

Kenneth McC. De Weese, Thomas R. Morrow, Robert W. Quarles, and Lathrop, Morrow, Fox & Moore, for defendants.

PHILIPS, District Judge. This controversy grows out of the acknowledgment of satisfaction of a second mortgage deed executed by the defendant railroad company to the defendant the Massachusetts Loan & Trust Company. Under the provisions of the mortgage, in case of default in the payment of interest or principal of the bonds secured, for a specified period, the trustee, upon request of a majority of the bondholders, instead of foreclosing and selling, could require the railroad company to procure, make, and cause to be made, a transfer and assignment of all outstanding shares of the capital stock of the railroad company (excepting 13 shares, to be held for qualifying the local directors) to the said trustee, in trust for the pro rata benefit of the said bondholders, so as thereby to convert the mortgage bonds into capital stock of the railroad company. Upon the issue of said stock the trustee was to accept the same in full satisfaction of the mortgage, and execute a proper deed of release of the mortgage. This provision of the mortgage was carried out by the trustee on default of payment of interest and principal of the bonds. The complainant, who received $19,000 of the (say, in round numbers) $1,700,000 of the bonds, instituted suit October 26, 1897, against the said railroad company, the said trustee, and O. M. Queal, recorder of deeds of Jackson county, Mo., where the mortgage was recorded, the purpose of which was merely to set aside said acknowledgment of satisfaction on the ground that the satisfaction was not made in conformity to the requirements of the statute of the state (Laws Mo. 1897, p. 3), which provides that the recorder of deeds shall require the releasor of a mortgage to present to the recorder for cancellation the notes secured, or affidavit of their loss. The applicability of this statute to the deed of release in question having arisen in limine before this court, it held, as it now holds, that the validity of the release is not affected by said statute. In the first place, this statute was enacted in 1897,—several years subsequent to the execution of the mortgage deed and its admission to record. To subject this mortgage to the operation of this statute would obstruct the plan for satisfying the mortgage provided for in the antecedent contract. The mortgage provided that the trustee should do certain things when requested thereto by a majority of the bondholders, and the mode of satisfaction was prescribed thereby. Under the constitution of the state, the legislature is prohibited from enacting any law with a retrospective operation. Furthermore, as applied to railroad mortgage bonds, scattered, as they usually are, over

the commercial world, the practice prescribed by this statute would be quite impracticable. Dickerman v. Trust Co., 20 Sup. Ct. 311, Adv. S. U. S. 311, 44 L. Ed. ——. The history of the abuses, wrongs, and complications this statute was intended to rectify furnishes persuasive proof that it was not the legislative mind to apply the act to the instance of a release made under the provisions of such antecedent mortgage as this. Complainant does not, in his brief, insist upon this objection. After said expression of opinion by the court, the complainant filed an amended bill, but not until after the defendants had made answer to the original bill, and without making replication. This amended bill was filed on the 7th day of July, 1898, in which, for the first time, he attacked the provision of the mortgage respecting the exchange of the bonds for capital stock of the road, and the manner of releasing the mortgage lien, on the ground of lack of authority to insert such provision in the mortgage. Without going into details, suffice it to say that prior to 1893 there existed in the vicinity of Kansas City, Mo., various properties, commonly known as the "Winner Properties," consisting of a short line railroad, an unfinished railroad bridge over the Missouri river, and large tracts of land, all of which were incumbered in sums aggregating several millions of dollars. The complainant was among the many creditors of one of these estates. These properties, after passing through receivership, foreclosures, and sales, by convention of the creditors passed to one Samuel Snow in trust. Plans for reorganization and the conservation of the rights and interests of the many creditors of these various properties were proposed, which eventuated in the creation of a corporation known as the Union Security Company, which was to become the depository of the legal title to said properties in working out the plan of reorganization. To this end, the active promoters of the enterprise from time to time presented to the interested creditors plans, in the form of proxies or powers of attorney, to be executed to said Union Security Company. This culminated in what is known as "Proxy C," the substantive effect of which was that the title to said properties should be placed in said Union Security Company. The railroad aforesaid was to be chartered as the Kansas City & Atlantic Railroad Company, to which new company the Union Security Company was to convey all the said properties, whereupon the railroad company was to issue its first and second mortgage bonds in favor of the said creditors, ratably, secured by mortgage on said railroad property, with said Massachusetts Company trustee. The second mortgage bonds aggregated something over $1,700,000.

Stripped of infinite verbiage and involved statement, when reduced to its legal analysis the only additional issue presented by the amended bill is that the power of attorney, or proxy, given by the complainant to the Union Security Company, did not authorize the insertion of the provision in the second mortgage deed under which the trustee released the mortgage, and provided for the conversion of the bonds into shares of stock. There are some general statements, more of the nature of innuendoes than averments of facts, by which the pleader, as may be inferred from the trend of counsel's argument, insinuates fraud in the conveyance of the property to the Kansas City & Atlantic Rail-

road Company, and kindred matters. But these are little more than matters arguendo by counsel. General innuendoes in pleading are not sufficient to raise questions of fraud. The specific acts must be charged, constitutive of fraud. U. S. v. Atherton, 102 U. S. 372, 26 L. Ed. 213; U. S. v. Norsch (C. C.) 42 Fed. 417. No ambiguity in the proxies is alleged, to remove which the interposition of a court of equity is invoked. On the contrary, at the argument of this case counsel for complainant distinctly disclaimed any purpose of the bill to have either modified or set aside either proxy C or D. Such statement, made in open court, binds the party,—as much so as if specifically pleaded. Oscanyon v. Arms Co., 103 U. S. 261, 26 L. Ed. 539; Butler v. National Home, 144 U. S. 64, 12 Sup. Ct. 581, 36 L. Ed. 346. If, therefore, the language of the proxies, when read by their four corners, is broad enough to authorize the terms inserted in the mortgage, it silences the complaint.

Proxy C was printed on the back of the plan of reorganization, and therefore the two instruments may be considered together. By the fifth paragraph of the plan, the trustee under the second mortgage is given large discretionary powers, among which is the power:

"While said interest shall remain unpaid on said mortgage bonds," he "may take possession of the properties, including said first mortgage bonds, not then sold or disposed of, to have, hold, and use the same, finishing the construction and equipment of said properties, and operating and conducting the business thereof, and caring for and making such alterations, additions, extensions, changes, or improvements thereof as may be necessary to the convenient and advantageous use of the same, with such incidental and further powers and rights in said trustee as may be usual in like cases, or which said Union Security Company may deem appropriate to and for the protection of each and every interest under this plan of reorganization; and, second, said mortgage deed may likewise provide for a transfer in trust of all the capital stock issued in pursuance of this plan, which shall give the second mortgage bondholders right and power to choose a board of directors, thereby conferring upon said second mortgage bondholders substantial possession and complete legal control of all the property, until the net earnings thereof are sufficient to pay the interest on all said second mortgage bonds, regularly and continually."

The seventh paragraph is as follows:

"Provided, if the Union Security Company should deem it necessary or advisable, in order to conform to the provisions of Missouri law, then the provisions herein contained for the issue of the capital stock and bonds of said new company may be modified in any manner, and so far as can be done without affecting the relative rights of the several security holders who by the provisions herein set forth are entitled to receive second mortgage bonds."

The power of attorney, printed on the front of this plan, contained the following comprehensive term respecting the authority of the agent, the Union Security Company:

"To take any and all measures necessary or proper, in its discretion, to carry out the plan of reorganization printed on the back hereof."

In its ultimate results, the difference between what would probably have worked out under plan C, as interpreted by complainant, and the provision in question inserted in the second mortgage, is rather theoretical than practical in importance. Under the former, while the interest on the mortgage bonds remained unpaid the trustee might take possession of the property and any undisposed of first mortgage

· bonds, and hold and use the same for finishing, operating, and improving the property, or said mortgage deed might provide for such transfer · of all the capital stock of said properties issued under this plan, so as to enable the second mortgage bondholders to choose a board of directors, with the ulterior object in view of giving them substantial possession and control of the property "until the net earnings thereof are sufficient to pay the interest on all said second mortgage bonds, regularly and continually"; whereas, under the mortgage as drawn, after default for a given period the trustee, instead of closing in and taking possession, was authorized to· call in the bonds, and exchange them ratably for stock in the railroad, which represented all the property. Upon this being consummated, the stockholders, by operation of law, · would be entitled to the possession and absolute control of the property, to manage it in their own way, giving them right to the entire proceeds, but, just as they would have held under plan C, subject ·to· all priorities of the first mortgage bondholders. The obtaining of any interest on the bonds by reason of the possession and control of · the road would depend entirely upon the same contingencies, either under plan C, or the provisions of the mortgage; that is, as to whether . or not there would be any residue applicable after taking care of the interest under the first mortgage bonds, and the running expenses. So that the holding of the stock of the company, and operating the property by the stockholders under the mortgage, or taking possession and operating under plan C, would about reach the same result in the end.

Whatever, however, may be said technically respecting the limitations of the discretion lodged in the agent by proxy C, it must be conceded that his discretionary authority was effectively extended by proxy D, executed by the complainant and the other bondholders on the 17th of May, 1893, subsequent to proxy C, and before the issue of the mortgage bonds. After reciting the fact of the acceptance of said plan C, and the expectation that the new railroad company, which was being promoted by the Union Security Company, would purchase said properties, and that arrangements were being made for the issue of certain bonds by said new railroad company, to· be secured by mortgage on said acquired properties, etc., and after reciting that the° Union Security Company had computed the amount of second mortgage gage bonds, "and my proportion thereof, face value, is $19,000," this power of attorney proceeds:

"Now, therefore, I, A. B. Lyman, * * * do hereby accept said amount . of said bonds from the Union Security Company as my full, just, and equitable part of the whole issue of said second mortgage bonds under any and all plans, proxies, or powers of attorney made or granted by me. And I also ·hereby consent, and accept and adopt, and do hereby fully authorize, any and all such modifications in the details of ,any and all said plans for organizing said Kansas City & Atlantic Railroad Company, and the fixing of the amounts, and the issuing and disposal of its capital stock and mortgage bonds, as the directors of the Union Security Company may deem advisable, giving and hereby granting unto the directors of the Union Security Company full discretion and authority in and about the premises; and I do hereby further agree to accept the above-named amount, namely, $19,000 of said second mortgage bonds of said railroad, when they shall be ready for delivery, in full payment and satisfaction of all my rights and interests under any and all said plans

of reorganization; and, on such delivery or tender, I hereby release and discharge the said Union Security Company, etc., from any and all claims and demands, of any and every nature whatsoever, which I have or may have had, or may be entitled to, against the Union Security Company, except as to my interest as a stockholder in said Union Security Company, or as to my interest in the first mortgage bonds of the Kansas City & Atlantic Railroad Company, which I have agreed to receive in exchange for my said stock in the Union Security Company."

Under this carte blanche the complainant consented, not only to accept the mortgage bonds issued, but consented to and authorized "any and all such modifications in the details of any and all plans, and the fixing of the amounts, the issuing and disposal of its capital stock and mortgage bonds, as the directors of the Union Security Company might deem advisable"; giving to them "full discretion and authority in and about the premises." The bonds drawn and mortgage made were, as the proof shows, in accordance with the direction of the Union Security Company, the complainant's agent, and upon their face the bonds had written:

"This bond is one of a series of three thousand six hundred bonds of like tenor and amount, and of even date herewith, issued by said railroad company, amounting in the aggregate to one million eight hundred thousand dollars; each and all of said bonds and coupons being secured by and subject to all the terms, provisions, and conditions of a second mortgage deed of trust, which is hereby referred to and made a part of this bond, bearing date July 1st, 1893, given by said Kansas City & Atlantic Railroad Company to said Massachusetts Loan & Trust Company as trustee for the holder of said bonds, upon that part of the corporate properties, franchises, rights, and privileges of said railroad company which is thereby conveyed."

Complainant received his quota of said bonds on the 10th day of January, 1894. He is presumed, as matter of law, to have read the recitations of the bond, and was thus advised of the provisions of the mortgage. Caylus v. Railroad Co., 10 Hun, 295, affirmed in 76 N. Y. 609; Stanton v. Railroad Co., 2 Woods, 523, Fed. Cas. No. 13,297; Morton v. Railway Co., 79 Ala. 590; Jones, Corp. Bonds & Mortg. § 196. No better or safer rule has been established for the construction of a contract than that placed upon it by the conduct and acts of the parties themselves before any controversy arose between them. Lumber Co. v. Stump, 30 C. C. A. 260–264, 86 Fed. 578, and cases cited. The Union Security Company and the railroad company, when they wrote into the mortgage the provision in question, most certainly understood that they were authorized to do so under the proxies from the beneficiaries. And when the complainant accepted his bonds, referring on their face to the mortgage, and retained them for over four years, without question of the authority under which they were drawn, he must be held to have acquiesced in and ratified the construction placed on his power of attorney by the other parties. So did all the other bondholders construe it by their acquiescence.

Aside from these considerations, it does seem to the court that upon principles of common right, equality, and good conscience, this complainant has no standing in a court of equity. He was not only advised of the purpose of the reorganization, but he knew that the Union Security Company was the constituted agent of all the bondholders in the old companies, through which the organization of the new railroad

101 F.—41

company was to be accomplished; and he acquiesced for nearly five years in what his agent had done in the premises. It therefore comes without grace for him to point out the freckles, warts, and ugly features of the child of his adoption,—the Union Security Company. With full knowledge of the sole purpose of its creation, he made it his agent to consummate the mortgage contract with the railroad, and accepted and pocketed, and yet holds, the bonds secured under the provisions of the mortgage. If the language of his commission to his agent was in any degree ambiguous, it should be most strongly construed against him, in favor of those who acted upon it, and especially so in favor of third parties, where rights have supervened. As already stated, he received these bonds, referring him directly to the provisions of the mortgage executed simultaneously, in January, 1894; and not until the amended bill was filed herein, four and a half years afterwards, did he ever challenge the authority of his agent to direct and assent to such mortgage. It is the accepted doctrine that, in respect of railroad bonded indebtedness, each bondholder, by implication, is brought into contractual relations with every other bondholder, analogous to that of stockholders. As such, his individual notions and interests are so wrapped up and identified with those of his fellows that they must be measurably subordinated to the judgment and interests of the composite body. The single bondholder, representing only 2 per cent. of the aggregate debt, like this complainant, may not, therefore, pursue such course in self-seeking as will be ruinous to the interests and rights of his fellow bondholders. "He is not a partner with them, nor strictly a tenant in common, but the relation with which he introduces himself by his purchase imposes upon him some duties. Having a common interest with others in the security of the mortgage, he is under the duty of so acting as not to destroy its value. He has a right to make use of the mortgage to enforce the payment of his bonds, but not to obtain an advantage over the other bondholders." Short, Ry. Bonds, §§ 20–27. Consequently, in the absence of fraud and unfairness, the minority may not defeat the wishes of the whole body of associates respecting the security common to all. Shaw v. Railroad Co., 100 U. S. 605, 25 L. Ed. 757. How much more should this rule of equity apply to this case, where all the bonded creditors, jointly interested in the salvage from the wreckage of the Winner properties, united in a general scheme of reorganization, and constituted a common agent, under like power of attorney, in whose action 98 per cent. of the bondholders acquiesced, and when to undo what this great majority have assented to would amount to disorganization and inextricable confusion! Neither law nor the sense of fair play will permit this single bondholder to stand by for years, and observe the up and down vacillations of railroad property, before deciding whether or not he prefers to hold onto his bond to accepting the stock, while all the time conscious, as the law presumes him to have been, of the fact that the other stockholders and the railroad company were proceeding upon the assumption that the mortgage was wiped out, and the bonds converted into stock. The conversion, he well knew, to be effective, must be as to all the bonds. It must be a unit or a failure. Therefore this complainant owed it to every other bond-

holder, the moment his bond advised him on its face of the provisions of the mortgage securing it, to speak out, if he reprobated the act of his agent, or to forever keep his mouth shut. What would be the consequences of granting the prayer of this bill? It would vacate the deed of release of the mortgage, and, of consequence, restore the mortgage. This would be followed by the further relief prayed for,—of eliminating from the mortgage the provision for converting the bonds into stock, when 98 per cent. of the bonds have been so converted for six years. What then? Would the mortgage be foreclosed at the suit of Mr. Lyman, solely for his benefit? How does he propose to restore the status quo? He does not even deign, by his bill or suggestion aliunde, to disclose what his mind or plan is in this respect. The bill is framed in too selfish a spirit to admit of any sentiment of altruism,—to live and let live. What changes may have taken place in the status of this property since January, 1894, and what rights of third parties may have supervened, touching the corpus of the railroad, since the satisfaction of the mortgage, are something more than mere imagination or conjecture. A part of the road, it is suggested, has passed into other hands. The complainant does not even offer to return the bonds he has held, to delight his eyes, all these years, while repudiating in his bill the mortgage upon which the execution of the bonds was dependent. He seems to care naught about how confounded the confusion, how far-reaching the disaster of the disruption, to result from his late discontent, if, only, like his prototype in the Merchant of Venice, he can have his bond. The strictures of the learned judge in Symmes v. Trust Co. (C. C.) 60 Fed. 830–855,—a case quite similar in some of the principles involved,—are applicable to the double and questionable attitude of this complainant.

Much of the discussion on behalf of the complainant, while creditable to the research and industry of counsel, is quite academic, and outside of the real issues presented by the pleadings. This is especially so as to the discussion respecting the validity of contracts made between two corporations represented by practically the same officers. Dealings between corporations are not necessarily affected or vitiated by reason of the knowledge such officers may have acquired independently of their official relations to the corporate body. Nor does a sale of the property of one corporation to a new corporation, the majority of whose governing officers are common, vitiate the sale. Goodwin v. Canal Co., 18 Ohio St. 169; Fulton Bank v. New York & S. Canal Co., 4 Paige, 126; Manufacturers' Sav. Bank v. Big Muddy Iron Co., 97 Mo. 38, 10 S. W. 865; Miller v. Railroad, 24 Barb. 312; Leavenworth County Com'rs v. Chicago, R. I. & P. Ry. Co., 134 U. S. 688, 10 Sup. Ct. 708, 33 L. Ed. 1064. Most certainly, such transaction will not be set aside without proper pleading, nor without showing special resultant damages, by a stockholder. But it is a sufficient answer to do this and like innuendoes throughout the brief of complainant's counsel to say that Mr. Lyman took his bonds with full knowledge of Bates' and Amory's relation to the entire scheme of reorganization, and the general plan and method of consummating it.

There is one further matter worthy of consideration, in the way of granting the relief sought by this bill. It will be observed, on refer-

ence to proxy D given by complainant, that it is recited that the said Union Security Company "is promoting the organization of a corporation to be called the Kansas City & Atlantic Railroad Company, which new railroad company, it is expected, will purchase the properties, franchises, and privileges which said Union Security caused to be bid in and acquired at foreclosure sales for the purpose of said plan; and, whereas, arrangements are being made for the issue by said railroad company of certain bonds, to be secured by mortgages on said acquired properties, franchises," etc. So it appears that when said plans and proxies were being formulated and executed the defendant railroad company was but in embryo. It was not a party to the plan, or the proxy. When it came to the issue of bonds and the execution of the mortgage, it certainly was a factor to be consulted as to the form, substance, and provisions of both the bonds and the mortgage. The constituency of the new railroad were different from the creditors of any one of the Winner properties which passed through the Union Security Company to the new railroad company. The latter received the properties in which the different creditors were interested as distinct bondholders. Its board of directors was not the same as that of the Union Security Company. It made the mortgage by convention between it and the Union Security Company. The mortgage contract, in so far as the railroad company is concerned, is a unit. The railroad company, a distinct legal entity, has been guilty of neither fraud nor deceit in executing the mortgage. It made it in conformity with the wishes of the Union Security Company. It came to no other compact. How, then, can this mortgage be set aside, in respect of so material provision as that for the exchange of the stock of the company for the bonds, instead of a foreclosure and sale, without vacating the entire instrument? Once vacated, it is not within the power of the bondholders to compel the giving of any other character of mortgage by the railroad company. Indeed, under the express terms of the plan of reorganization, the bonds and the mortgage are interdependent contracts. Destroy the mortgage, and the bonds go the same way. "A corporation is not responsible for acts performed or contracts entered into before it came into existence, by promoters or other persons, assuming to bind the company in advance. Such contracts only bind the individuals who make them." Stanton v. Railway Co. (Sup.) 2 N. Y. Supp. 298–301; 1 Mor. Priv. Corp. par. 547, note; Munson v. Railroad Co., 103 N. Y. 58, 8 N. E. 355. To give effective relief to the complainant's contention in argument, the court would have to rewrite the mortgage and the bonds. It would have to strike out of the mortgage the entire condition pertaining to default and the powers of the trustee, and write in its stead the conditions of proxy C as now interpreted by the complainant. The court would have to ignore proxy D, which committed to the agent, the Union Security Company, the discretion of modifying the plan. Necessarily, all the second mortgage bonds would have to be recast, because, as now executed, they refer to, and make part of themselves, the provisions of the mortgage securing them. How could the court undertake such radical and revolutionary work, affecting all the old bondholders, as well as the present holders of stock, for which 98 per cent. of the new bonds were

exchanged, without the presence of all these interested parties, and giving them their day in court? They are not, for such purpose, represented here by the trustee named in the mortgage. That trustee has fully executed the trust created by the mortgage instrument, and therefore has become functus officio,—at least, as to all the bondholders who surrendered their bonds in exchange for the stock of the railroad company. On the whole case, this bill should be dismissed. Decree accordingly.