Coe *v.* East & W. R. Co. of Alabama *et al.*

Grant *et al. v.* Same, (Schley, Intervener.)

*(Circuit Court, N. D. Alabama, S. D.* January 12, 1892.)

1. CORPORATIONS—ISSUE OF STOCK FOR CONSTRUCTION OF RAILROAD—CONSTITUTIONAL RESTRICTION.

Certain stockholders and directors of a railroad company, who owned a controlling interest therein, having the best interests of the company in view, and with the concurrence of all the other stockholders, negotiated a contract on its behalf with a construction company for the building of a portion of the road for $10,000 per mile in the bonds, and $10,000 per mile in the stock, of the railroad company. *Held,* that as the contract appeared to be fair, under the circumstances, and involved no fraudulent overvaluation of the work, the bonds and stock issued in accordance with its terms were not void, under Const. Ala. art. 14, § 6, providing that "no corporation shall issue stock except for money, labor done, or money or property actually received, and all fictitious increase of stock or indebtedness shall be void."

2. SAME—CONTRACTS BETWEEN COMPANIES HAVING SAME DIRECTORS—RATIFICATION—ISSUE OF BONDS.

The same persons, being also the stockholders and directors of an iron company, negotiated in good faith a contract between the railroad company and the iron company, which took the form of a resolution by the railroad company to lease a railroad owned by the iron company, and pay in stocks and bonds, and of a subscription by the iron company to be paid in property, viz., a lease of their railroad; and the contract was ratified by a unanimous vote of all the stockholders of the railroad company. *Held,* that the contract was, at worst, only voidable, and as no fraud or intentional overvaluation appeared, and the consideration was as nearly adequate as could be expected under the circumstances, the bonds issued in accordance therewith were valid.

3. SAME—ISSUE OF BONDS—PURCHASE BY CONTROLLING DIRECTORS AT DISCOUNT.

Subsequently, the same persons, retaining control of the railroad company, forebore to collect interest on its first mortgage bonds held by them, and advanced to it money for repairs made necessary by an unusual flood, and for improvements, until such floating debt amounted to upwards of $300,000. For the purpose of paying this, a meeting of stockholders authorized the issue of debenture bonds of the railroad company, not exceeding $500,000, to be secured by a second mortgage. The directors had previously resolved that such bonds, when issued, should not be disposed of at less than 65 per cent. *Held,* that the purchase by such persons, holding the entire floating debt, of the whole amount of bonds authorized, paid for in such indebtedness, and the balance in cash, was valid.

4. SAME—RIGHTS OF BONDHOLDERS—IMPEACHING PRIOR INDEBTEDNESS.

Thereafter, in accordance with resolutions of the stockholders in the railroad company, which were assented to by all the stockholders, and which authorized the issuance of consolidated first mortgage bonds, in order to extend and improve the road, to take up and retire the first mortgage bonds and debenture bonds, and to cancel the first and debenture mortgages, the railroad company issued to the same persons consolidated first mortgage bonds, and took up at an agreed rate the debenture bonds purchased by them, the first mortgage bonds and stock issued to them and to the iron company, and the first mortgage bonds and stock issued to the construction company, and subsequently sold to them by that company to enable it to complete the road. *Held,* in an action to foreclose such consolidated first mortgage, that subsequent purchasers from them of such consolidated first mortgage bonds were chargeable with notice of the prior bonds and mortgages, and of the terms on which such consolidated bonds were issued, and that, the railroad company acquiescing in the transaction, and no intention to defraud subsequent creditors being shown, such subsequent purchasers could not impeach the prior indebtedness on which such bonds were issued, in order to invalidate the balance of the bonds.

5. EQUITY—RELIEF FROM FRAUD—RELIANCE ON FALSE REPRESENTATIONS.

Holders of first mortgage bonds of a railroad, having contracted with brokers to sell them all their bonds, transferred to the brokers a portion of the bonds, and together with the brokers fraudulently procured the listing of the bonds in the New York Stock Exchange. *Held,* that persons who loaned money to the brokers on such bonds as security, relying either on the standing and representations of the brokers, or on quotations made in the New York Stock Exchange, and produced by fictitious manipulations of the brokers, and not on the false representations made by the

original holders to secure the listing, and who, on nonpayment of the loans, were compelled to buy in the bonds held as security, were not, on the ground of fraud, entitled to priority over such original holders in the application of the proceeds of foreclosure to the satisfaction of the bonds.

6. CORPORATIONS—MEETING OF STOCKHOLDERS—NOTICE—REPORT.

Notice was given to the stockholders of an Alabama railroad company of a meeting to be held at a place in the state on April 20, 1887, to increase the bonded indebtedness of the company, and prior to that date every stockholder consented in writing to the increase. On March 24, 1887, the board of directors held a meeting in the state, at which the call of the stockholders' meeting and the written consent of all the stockholders were recited, and the issuance of the bonds was authorized; and subsequently a report of the directors' meeting, reciting the stockholders' consent, was filed with the secretary of state. *Held*, that there was a sufficient compliance with the law of Alabama providing that a stockholders' meeting to increase the indebtedness of a corporation must be held in the state, that the call must state the time, place, and object of the meeting, and that a report of the meeting must be filed with the secretary of state.

7. SAME—FORECLOSURE OF MORTGAGE TO SATISFY BONDS—RIGHTS OF INTERVENING JUDGMENT CREDITORS.

Part of the consolidated first mortgage bonds of a railroad company were placed in the hands of a trust company, to be issued to a construction company on certain certificates of the completion of an extension of the road. When the extension was practically completed, the bonds were issued on certificates to the construction company, but were retained by the trust company to secure prior advances. Soon after, the construction company failed, and a contractor, whose contract to build part of the road was entirely with the construction company, and contained no agreement to satisfy the same in the railroad bonds, sued the railroad company, and obtained judgment for the balance due. *Held*, that the contractor had no claim on the bonds in the hands of the trust company to subject them to the satisfaction of his judgment.

In Equity.   Bill filed by the American Loan & Trust Company, trustee, for which company George S. Coe was substituted, pending the suit, as trustee and complainant, against the East & West Railroad Company of Alabama and others, to foreclose the first consolidated mortgage of said railroad company, for the equal benefit of the holders of its bonds, to the number of 1,750; and auxiliary bill by Grant Bros. and others against the same defendants and James W. Schley, an intervening judgment creditor, to declare void 966 of the bonds, and to foreclose said mortgage for the benefit of the holders of the balance of the bonds. Decree for complainant Coe, and denying the relief prayed for by complainants Grant Bros. and others, and by intervener, Schley.

For prior opinions rendered in the course of this litigation, see 37 Fed. Rep. 242; 40 Fed. Rep. 182, 384; and 46 Fed. Rep. 102.   For opinion on denial of motion to dismiss appeal of Grant Bros. from the decree herein, see 50 Fed. Rep. 795.

*R. L. Fowler,* for complainant.

*John H. Inzer,* for East & W. R. Co.

*Calhoun, King & Spaulding,* for Grant Bros.

*Wager Swayne* and *A. Prentice,* for Browning Bros.

*F. S. Smith,* for Kelly & Byrne.

*Webb & Tillman,* for intervener and defendant Schley.

PARDEE, Circuit Judge.   The American Loan & Trust Company, in June, 1888, filed its bill to foreclose the consolidated first mortgage of the East & West Railroad Company of Alabama, for the equal benefit of the holders of all or any of its bonds.   The bill alleged that the railroad

company had disposed of 1,750 of said bonds to *bona fide* holders for value, and that all of said 1,750 bonds were valid. The bill also disclosed the fact that the mortgaged premises were in the hands of a receiver appointed by this court. It prayed foreclosure and sale of the property for the payment of the said bonds, and that the mortgaged property be placed in the hands of the receiver to be appointed under the foreclosure bill, which was subsequently done, one receiver of this court surrendering possession to another.

On the 26th of July an order was granted allowing Grant Bros. to file an auxiliary bill in behalf of themselves and all other bondholders similarly situated, which bill set up the fact that 966 of the 1,750 bonds were invalid and illegal, and were taken by the defendants W. C. Browning, Edward F. Browning, John Hull Browning, and Amos G. West from the railroad company without consideration, and were a fictitious debt, and that Eugene Kelly and John Byrne had acquired an interest in said bonds with full knowledge of all these facts. It also alleged that the bonds held by Grant Bros. and other holders for value had been acquired for a valuable consideration, without notice of any defect, and that they had been induced to buy the same by a series of misstatements and misrepresentations as to the condition of said road, the payment of its interest, and its fiscal condition, made by Edward F. Browning, J. Hull Browning, and A. G. West, or Grovesteen & Pell, a firm of brokers acting in conjunction with said last-named parties. The bill does not seek to prevent the foreclosure of the mortgage, but prays that the 966 bonds should be adjudged illegal, fictitious, fraudulent, and void, and not entitled to participate in the proceeds of the mortgaged premises; and that the foreclosure prayed for in the original bill of the American Loan & Trust Company should be for the equal benefit only of the said consolidated first mortgage bonds adjudged to be valid by the decree to be rendered in the Grant Bros. case.

Each of the individual defendants has filed an answer denying generally and specifically all the allegations of Grant Bros.' bill of complaint, so far as said averments impeach, in any particular, the *bona fides* of said defendants, respectively.

Subsequent to making up the issues, the American Loan & Trust Company having failed in business, and gone into the possession of a receiver, due proceedings were had by which the American Loan & Trust Company was removed as trustee under the first consolidated mortgage of the East & West Railroad of Alabama, and George S. Coe, Esq., substituted as trustee and complainant herein.

To the main bill, defendant railroad company and James W. Schley have filed answers. The intervention of Schley is also at issue.

*Auxiliary Bill of Grant Bros.* The complainants in the auxiliary bill have standing in this cause only as *bona fide* owners and holders of bonds issued under the mortgage granted in 1887 by the East & West Railroad Company of Alabama, in which mortgage all bonds are styled "First Consolidated Mortgage Bonds." The resolutions of the stockholders of the East & West Railroad Company of Alabama, which authorized the

issuance of the first consolidated mortgage bonds, and which was assented to by each and every stockholder, recite that—

"The bonds were to be issued for the purpose of providing funds for the extension and completion of the road of the company, to widen its gauge, and to take up and retire the present outstanding first mortgage bonds and debenture bonds, and retiring them, and canceling said first and debenture mortgage," etc.

At the time those resolutions were passed, there was outstanding indebtedness of the East & West Railroad Company of Alabama, and to a large amount represented by bonds secured by a first mortgage of the railway property, and by debenture bonds secured by a second mortgage of the railway property.

The holders of the first consolidated bonds are charged with notice of the prior bonds and mortgages, and of the terms upon which their own bonds were issued. *Caylus* v. *Railroad Co.*, 10 Hun, 295; *Bronson* v. *Railroad Co.*, 2 Wall. 287–311. This being the case, it is very doubtful whether complainants can impeach the indebtedness which existed prior to the issuance of their bonds, and upon which their bonds are based. At the time the first consolidated bonds were authorized and issued, every interest consented,—every bondholder, every stockholder, and the board of directors, and, so far as the record shows, every creditor; and the transaction was the consolidation of two series of bonds secured by mortgages of different dates into an equal number of bonds running a longer time, and bearing the same rate of interest, secured by one mortgage on practically the same property. Any and all the defects of consideration, and all equities existing to the prejudice of the prior bonds, were waived and extinguished, and it was competent for the railroad company to make such waiver. See *Bronson* v. *Railroad Co.*, *supra.* Even if the railroad company had been wronged or cheated, it would seem that subsequent creditors and subsequent purchasers have no right to question the transaction as long as the railroad company acquiesces, and no intention to defraud subsequent creditors is shown. See *Graham* v. *Railroad Co.*, 102 U. S. 148. And the same case denies, in respect to such matters, that a corporation stands on any different footing from an individual debtor.

The issues made up by the pleadings challenge, and inquiry has been largely made into, the transactions in pursuance of which the railroad company in 1882, 1883, 1884, and 1885 put out the first mortgage bonds for purchase and construction of its railroad, and in 1886 issued its debenture bonds, and sold the same to pay its floating debt. The real basis of the first mortgage bonds and of the debentures are two transactions in 1882,—the purchase of the Cherokee Railroad from the Cherokee Iron Works, and the construction contract with Michael Duff assigned to and assumed by the Southern Railroad Construction Company. The complainants claim that the Brownings and West had an interest in the Southern Railroad Construction Company, and that they were its agents or managers, and that practically it was a mere figurehead to represent the Brownings' interest. The evidence shows it to

have been, and to still be, for that matter, a duly incorporated company under the laws of the state of New Jersey.

If all the complainants' claim in that behalf be admitted, still the contract with the Southern Railroad Construction Company was binding upon the railroad company, as the same was fully and duly authorized at a meeting of stockholders held at the time the negotiations were pending, with full notice of all terms and details, and the same has been ratified from time to time by the stockholders and different boards of directors up to, if not since, the institution of this suit. And in this case the company in its answer still insists that it was a valid, binding contract. The various agreements in the record in relation to construction are to be considered as one contract, put in the form of a subscription to stock by Michael Duff,—an agreement with him to pay for construction, both stock and bonds, and the assignment to, and the assumption by, the Southern Railroad Construction Company, all in good faith and under the advice of counsel.

If it be conceded that the Brownings and West, who were directors of and controlling the East & West Railroad Company of Alabama, were also interested in and controlling the Southern Railroad Construction Company, and, as claimed, were the parties who actually advanced the means to build and construct the road, received the bonds and stock issued under the contract in payment therefor, and that the complainants, acquiring an interest years after, have been injured by the transaction, and can, in this proceeding, inquire into and attack the same, the question still is whether, under all the circumstances, the transaction was not valid. Certainly, if the contract inured to the benefit of the railroad company, and was the best available method for securing the construction of the road, and there was no palpable overvaluation of the work performed and moneys advanced, nor undervaluation of the stocks and bonds received in payment, and it resulted in no injury to any person in interest at the time, it should not be set aside on technicalities, but only in case of palpable intended violation of law. The case of *Van Cott* v. *Van Brunt*, 82 N. Y. 535, is directly in point:

"The right of the officers of a railroad corporation to enter into an agreement to build its road, and pay for the construction of the same in stocks and bonds, cannot be seriously questioned, and contracts of this description are frequently made for such a purpose. In Angell & Ames on Corporations, (section 590*a*,) it is laid down: 'An agreement is often made by railroads to pay the persons building them a certain proportion of the contract price in stock. Under such a contract the contractor is entitled to the proportion in stock, at its current market value, at the time payment should have been made. And if the stock depreciate, so that it has no market value, the amount agreed to be paid in stock must be paid in money.' See *Hart* v. *Lauman,* 29 Barb. 410; *Moore* v. *Railroad Co.,* 12 Barb. 156; *Porter* v. *Railroad Co.,* 32 Me. 539. If a contract can be made to pay in part for building a portion of the road, it may also be made to pay for the whole thereof in like manner, and there is no valid ground for claiming that, where the contractor is entitled to stock at its market value, he would be liable for the difference between the market value and the par value thereof. There is no evidence in the record before us to establish affirmatively that the value of the work done and mate-

rials furnished was less than the fair and just value of the stock, or that the road built and equipped was worth less than said stock. In fact the testimony shows that the amount expended exceeded the actual value of the stock and bonds which were received in consideration of the same.

"The evidence also established that the stock never had any market value whatever. It is true that some of the bonds were disposed of at 50 and 65 cents upon the dollar, and less, and in some instances by throwing in stock to the same amount, and one half more, and in one instance taken at par in part payment of a debt; but they were intrinsically valueless, and after a while were sold for only a nominal sum, until at last no one outside of the company would take either the bonds or stock at any real price. The arrangement for the building of the road was made after full deliberation and consultation, with the knowledge and approval of all the directors and stockholders. It was assented to as the only means furnished, and the only offer which could be obtained from any one, to insure the construction of the railroad. It was the best thing which could be done under the circumstances, was entirely satisfactory, and made most clearly without any intention to defraud the company or its creditors, and in perfect good faith. It is difficult to see how creditors could be defrauded, when all the property which the company ever had remained in its possession and under its control. * * *

"It is claimed that the defendant, as president, director, and trustee, having wrongfully appropriated the stock to himself without paying for it, takes all the obligations of a subscriber. This depends upon the question whether the transfer of the stock to the defendant and the application of the same was wrongful. It was done, as we have seen, with the full approval of the stockholders, and in fact was a necessity, and, without the contract entered into, no portion of the road could have been built. If the defendant had realized a sum beyond the amount actually expended, there might have been, perhaps, some ground for claiming that the arrangement should inure to and for the benefit of the company. As, however, this was not the fact, and no special advantage accrued to the defendant from the contract, and as there is no proof of any fraud, it is not apparent that there was any wrongful appropriation of the stock and bonds, or that the stock and bonds were diverted from their legitimate use. The mere fact that the defendant held a certificate of the stock which was transferred to him did not make him liable, as it was, to all intents and purposes, paid-up stock."

This case has received some adverse criticism, (2 Mor. Priv. Corp. § 826; Cook, Stocks & S. § 47, note 5; *Jackson* v. *Traer*, 64 Iowa, 483, 20 N. W. Rep. 764;) but it has been cited with approval and its doctrines have been reaffirmed by the court of last resort in the state of New York in the case of *Barr* v. *Railroad Co.*, 125 N. Y. 263, 26 N. E. Rep. 145, where it is said:

"The respondent has questioned the legality or validity of the issue of shares upon which plaintiffs base their right to sue. I do not think it is in a position to raise that question, and for several manifest reasons. All of the stock and bonds were issued in payment for the construction of the railroad, and were taken by a syndicate of persons who assumed the contract for the work. It is true that that syndicate was made up of members of the board of directors, but as the members of the syndicate were practically the company, and composed the whole number of stockholders, there was no one to object, and the manner in which they chose to divide up their interests in the proprietorship of the corporation, and to represent them in shares, concerned only themselves. No principle of law forbade the company agreeing to pay

for the construction of its railroad in the way or in the amount it did. *Van Cott* v. *Van Brunt*, 82 N. Y. 535. If the company's directors were interested in the work and profits of construction, and evaded a direct contract through the form or device of an intermediary contractor, that was a matter for the company, or for its stockholders, to take hold of. But the stockholders and the members of the syndicate were the same persons, and, however wrong the transaction might be if other persons were concerned, here no injury was effected to any one interested in the corporation. And, however illegal the transaction, there was no person apparently to complain of it. As the stock was issued as a part of the consideration for construction, it cannot be said that it was taken without value given, and the mode of its apportionment or division concerned only those interested in the contract through which it was received as payment.

"We may concede that the contract was voidable, as a scheme concocted by the directors for sharing in the profits of construction, but the difficulty is that all the members of the corporation were assenting to it. There was, however, in fact no fraud practiced upon the company. Practically, the promoters of the corporation in this way placed a valuation upon the corporate properties and franchises, which the contribution and expenditure of their money created; and the fact that they were created for an expenditure less than the par value of the aggregate issues of capital stock and bonds does not affect the question at all."

The constitution of the state of Alabama (article 14, par. 6) prescribes:

"No corporation shall issue stock or bonds except for money, labor done, or money or property actually received, and all fictitious increase of stock or indebtedness shall be void."

And section 1824 of the Code of Alabama (1876) provides:

"All subscriptions to the capital stock of any railroad proposed to be organized under the provisions of this article shall be taken payable in money, labor, or property upon money value, to be named in the list of subscriptions, and, in the event of the failure to perform the labor and deliver the property according to the terms of the subscription, the subscribers shall be bound to pay the amount named in the subscription list in money."

A provision in the constitution of Arkansas, almost identical with that of the state of Alabama, has been construed by the supreme court of the United States not to prevent the carrying out of an agreement by which the bondholders of a railroad stipulated that the road should be bought upon foreclosure by trustees, who should convey it to a new company composed of bondholders, who should receive mortgage bonds of the n w company in exchange for their old bonds, and full paid-up stock subject to the mortgage debt, without any payment of money. The court said:

"But appellant disputes its liability upon the bonds given for the balance, upon the theory that they were prohibited from issuing them by the eighth section of the twelfth article of the constitution of Arkansas, adopted in 1874. That section provides that no 'private corporation shall issue stock or bonds except for money or property actually received or labor done; and all fictitious increase of stock or indebtedness shall be void.' In support of this view our attention is called to the fact, admitted by the demurrer, that the full value of the property, rights, and privileges conveyed to appellant did not exceed $1,300,000, the amount at which the capital stock was fixed; and con-

sequently, it is argued, the $2,600,000 of bonds were issued without any consideration received in money, property, or labor, and represented only a fictitious indebtedness. In other words, appellant's vendors were fully compensated for their interests by taking to themselves its entire stock.

"We do not concur in this view of the case. It does not, we think, rest upon a sound interpretation of the state constitution. The prohibition against the issuing of stock or bonds, except for money or property actually received or labor done, and against the fictitious increase of stock or indebtedness, was intended to protect stockholders against spoliation, and to guard the public against securities that were absolutely worthless. One of the mischiefs sought to be remedied is the flooding of the market with stock and bonds that do not represent anything whatever of substantial value. In reference to a provision in the constitution of Illinois, adopted in 1870, containing a prohibition as to railroad corporations similar to that imposed by the Arkansas constitution upon all private corporations, the supreme court of the former state, in *Railroad Co.* v. *Thompson,* 103 Ill. 187-201, said: 'The latter part of the clause of the constitution in question, which declares that "all stocks, dividends, and other fictitious increase of the capital stock or indebtedness of such corporation shall be void," we think clearly points out the chief object which the constitutional convention sought to accomplish in adopting it; and to this we must look, in a large degree, for a solution of the language which precedes it. The object was doubtless to prevent reckless and unscrupulous speculators, under the guise or pretense of building a railroad, or of accomplishing some other legitimate corporate purpose, from fraudulently issuing and putting upon the market bonds or stock that do not, and are not intended to, represent money or property of any kind, either in possession or expectancy, the stock or bonds in such case being entirely fictitious.' " *Railroad Co.* v. *Dow,* 120 U. S. 287-297, 7 Sup. Ct. Rep. 482.

In the case of *Elyton Land Co.* v. *Birmingham Warehouse & Elevator Co.*, 9 South. Rep. 129, the supreme court of the state of Alabama, in a very able opinion, reviewed all the authorities touching the question of unlawful issues of stock.

As the law of Alabama governs the instant case, and as the decision is a full exposition of that law on the matter in hand by the highest court of the state, I quote at length as follows:

"Our examination satisfies us that the weight of American authority does not support the statement made by Mr. Cook, in section 47 of his work on Stocks and Stockholders, to the effect that the attempts which have been made, in cases where stock was issued for property taken at an overvaluation, to hold the party receiving such stock liable for its full par value, less the actual value of the property received from him, have been unsuccessful; and that, if there has been an overvaluation which is shown to have been fraudulent, then the contract is to be treated like other fraudulent contracts, and is to be adopted *in toto*, or rescinded *in toto*, and set aside. We have found no authority at all asserting the exemption of the stockholders from such liability, where it appeared that the stock subscription was governed by a statutory regulation at all similar to section 1805 of the Code of 1876, or section 1662 of the Code of 1886.

 *     *     *     *     *     *     *     *     *

"When legal provisions are found which are appropriately framed to secure the existence of such responsibility, it is not permissible so to construe them as to allow a mere formal and illusory compliance therewith to defeat the objects intended to be accomplished. No argument is needed to show that a requirement that the stock of a corporation shall be paid in money, or

in labor or property at its money value, inures to the benefit of persons who may become creditors of the corporation, in that it requires the capital stock to be the representative of substantial values, and insures the existence of a fund which must be within reach for the satisfaction of debts if the affairs of the corporation are managed as contemplated by the law. It is equally clear that if a stock subscription which is required to be made payable in money, or in labor or property at its money value, and is in fact made payable in property at the designated money valuation, may be satisfied by the transfer of property, the value of which is insignificant, or merely nominal, as compared with the valuation stated, then, so far as this provision of the law looks to the protection of creditors, it might as well have allowed the subscription to be made payable in 'chips and whetstones.' Except section 6, art. 14, of the constitution, and section 1805 of the Code of 1876, there was not, at the time of the formation of the appellee, in reference to the mode of satisfying stock subscriptions, adequate provision for the protection of such corporations. Those enactments are appropriate for this purpose. The requirements of section 1805 of the Code of 1876, that, ' in case of a failure to perform the labor or deliver the property according to the terms of the subscription, the money value thereof, as named in the list of subscription, shall be paid by the subscribers,' cannot be regarded as providing for a penalty to compel the performance of the labor or the delivery of the property. The evident meaning is that, in the event of such failure, the corporation shall receive the equivalent, and no more nor less than the equivalent, in money or the labor or the property, as the case may be. This clause of the statute is convincing that the statement of the money value of the property in which the subscription is made payable is a material feature of the contract, and that the property delivered must be of a value to correspond with that named in the subscription. As affecting the rights of creditors, the statute is simply a definite requirement as to what will constitute that trust fund to which persons dealing with the corporation have a right to look. The defendants in this case, in making and accepting payments on the stock subscriptions, were acting in a fiduciary capacity in reference to the fund. The performance of the contract of subscription, to be binding on creditors, should have been such as is required in the case of a contract between a trustee and one having knowledge of his trust obligation. In form the stock subscription was such as the statute called for. Under section 2023 of the Code of 1876, and section 8, art. 14, of the constitution, the stockholders are liable only for the unpaid stock owned by them. But the creditors are entitled to demand that the payment on the stock shall be an actual and *bona fide* discharge of the liability imposed by the contract of subscription. The defendants, in making and accepting payments in property, were bound to exercise their judgment and discretion, fairly and honestly directed to secure a substantial compliance with the terms of the contract. In the exercise of that judgment and discretion they are entitled to the benefit of whatever margin there may be for honest differences of opinion in the valuation of the property; but a deliberate and intentional overvaluation is not permissible. The transfer of the property known to be worth only $5,000 to pay a stock subscription of $200,000 does not bear the semblance of a compliance with the contract of subscription as to one of the essential terms thereof.

"The taking of property at a valuation forty times greater than its actual worth, which was known to the parties, shows upon its face the absence of a *bona fide* exercise of judgment and discretion in making the valuation, and an intentional noncompliance with the requirement that the property shall be taken at its money value. The absence of the fraudulent motive on the part of a trustee does not give validity to a mere simulated execution of the trust;

and an averment of fraud in reference thereto is unnecessary. The parties beneficially interested in the trust are entitled to a substantial compliance with its terms. They are not bound by an act of mere formal compliance which really involves their practical exclusion from the benefits intended to be secured to them. The capital stock of a corporation constitutes the basis of its credit, and persons dealing with the corporation have a right to assume that the stock has been actually paid in, or that it may be reached. The transaction whereby payment was attempted to be made, as shown by the averments of the bill in this case, is not binding on creditors, because it did not constitute such a payment as was contemplated by the terms of the contract of subscription, and was, in effect, a palpable evasion of the requirements of the statute."

I understand this case really decides that where $250,000 was subscribed to the stock of a company, and issued as fully paid up, and only property to the value of $5,000 paid therefor, the subscribers were liable in money to the creditors of the company for the difference between the value of the property transferred and the amount of their subscriptions. In reaching the conclusion, the court discusses the whole subject, and declares the principles involved, holding that in case of subscription to the capital stock of incorporated companies in Alabama payable in property, in order to release the subscribers from liability to creditors, there must be no fraudulent overvaluation of the property; no deliberate nor intentional overvaluation. The property to be delivered in payment must be of a value to correspond with that named in the subscription. There must be more than a formal and illusory compliance with the law. There must be a fair exercise of judgment and discretion, fairly and honestly directed to secure a substantial compliance with the law.

In the instant case, the evidence shows that the contract with the construction company was entered upon deliberately after extensive inquiry as to the best bargain the company could secure by those who were the principal owners of the East & West Railroad Company, having no interest other than to make the best bargain for the company that they could, and with the concurrence of every one of their fellow shareholders. E. F. Browning, the president of the railroad company, testifies fully to this, and also that he had acted under advice of counsel, believing he was doing just what his duty to the company required; that from the latter part of April, 1881, up to November, 1882, he made great effort to see if he could find any party who would build the road; he was recommended to see the Erlanger Syndicate, as represented by Frederick Wolf. He saw Mr. Wolf, who stated that he believed his syndicate would undertake to build the road for the bonds and stock, provided the road would run to Trustville, so as to connect with the Alabama Great Southern Railroad. They entered into considerable negotiations, and after a time Wolf informed him that his friends had declined to build the road at that time. Browning also made diligent search to see if he could find any one to build the road; called upon some large builders in New York, and presented the prospectus to them; but they one and all declined to build the road for all the stock and all the bonds which he had a right to offer; and he could not find any one who would build it on any more favorable terms,

nor on any terms at all, until he was introduced to the Southern Railroad Construction Company, which company offered to build it for its bonds at $10,000 a mile, and its stock at $10,000 a mile.

W. V. McCracken, a railroad builder of large experience, testifies as follows:

"*Question.* From your knowledge of that country, and your experience as a railroad builder, was this Duff contract a fair and reasonable contract for the East & West Railroad of Alabama to make for the building of their road? *Answer.* I think, from what I know of the country, and what little I knew of the circumstances at the time,—my impression was,—that it was a fair and proper contract to make. *Q.* Did you receive any stock and bonds in payment, in whole or in part, for the building of the East Tennessee, Virginia & Georgia Railroad? *A.* That portion of the East Tennessee, Virginia & Georgia at that time was called the 'Cincinnati & Georgia Road.' That was the organization under which that part of the road was built, and the persons with whom I was associated, and by whom I was employed at the time, did receive stock and bonds for the building of the road. *Q.* State, if you know, how many bonds and how much stock per mile those parties received for the building of that road. *A.* My recollection is they received twenty thousand dollars of bonds and twenty thousand dollars of stock per mile. *Q.* Does the line of the East & West Railroad cross the road of which you have just spoken? *A.* The old part of it does. * * * *Q.* Do you recollect whether Mr. Browning at that time asked you if you would build this road for ten thousand dollars per mile of its bonds and the same amount per mile of its stock? *A.* He either asked me whether I would build·it for that, or whether I would have built it for that. My answer was, I know, very emphatic that I would not do it in either case. *Q.* Could you offer to-day to build a road right through the same country through which the East & West is built, and equip it as called for by the Duff contract, for ten thousand dollars per mile of its bonds and ten thousand per mile of its stock? *A.* I certainly think not. I would not accept an offer to build such a road for such an amount of bonds and stock."

Gen. G. M. Dodge, an engineer and builder of railroads, of national reputation, testifies that he is experienced as a railroad builder, and that the contract of building the East & West Railroad of Alabama in 1882 was a reasonable and fair contract.

G. W. Bucholz, chief engineer of the New York, Lake Erie & Western Railroad, testifies as follows:

"*Question.* Did you notice what, by the terms of that contract, the East & West Railroad was to pay for the building of that extension? *Answer.* I did read the consideration; yes, sir. *Q.* From your experience as a railroad man, was that contract a fair and reasonable contract for the East & West Railroad Company to make for the building of that extension? *A.* Well, from my experience in the construction of railways, and from my general knowledge of the country through which this railroad runs, I consider the price paid for it, or rather agreed to be paid for it in the contract, as advantageous to the railroad company."

To the same effect is the testimony of Mr. George W. Ballou, a dealer in railroad securities and a builder of narrow-gauge railroads.

Stephen V. White, a large dealer in railroad bonds, says:

"I should think that $10,000 of bonds and $10,000 of stock was a low compensation for building the road."

Judge John W. Inzer says:

"A discussion was had in the board of directors whether the price mentioned in the Duff contract was a fair and reasonable price to give for building of that extension. I think it is my recollection that it was agreed that it was a fair and reasonable contract, and that if the work could be done at that price or prices the road could afford to pay. * * * The contract was discussed at the meeting; it was talked over, and agreed to and approved. *Question.* And I understand you to say that contract met your approval? *Answer.* It did. It was a fair and reasonable contract to make."

Mr. Thomas B. Inness testifies that about the time the construction was begun he spent several days in examining the property, and that he considers the contract, to give $10,000 a mile in bonds and $10,000 a mile in stock, a fair one,—to the railroad company.

All of these witnesses join in stating that the contract is not only intrinsically fair, but of a character common to new railroad construction, and naturally resorted to by the East & West Railroad Company, and, as some of them suggest, such as that company could not have got along without, which Mr. E. F. Browning, its president, testifies he found by earnest experiment to be actually the case. I find no evidence in the record, outside of suspicion, to the contrary. It is true there are some statements filed in the record showing that the actual cost in money to build the extension of the East & West Railroad Company was less than the par value of either the stock or bonds given in payment; but there is no evidence in the record to show what the actual value of the bonds and stock was. Certainly the fairness of a contract of the kind in question is not to be determined by the actual financial results ascertained on its completion.

On the whole case as presented to me I am not prepared to find that the transaction between the East & West Railroad Company and the Southern Railroad Construction Company for the building of the East & West portion of the railroad line for $10,000 per mile in bonds and $10,000 per mile in stock was any other than fair, and as liberal to the railroad company as could have been expected. Certainly, there was no fraudulent overvaluation of the labor and stock involved, nor, in my opinion, any deliberate, intentional overvaluation, and it seems there was a fair exercise of judgment and discretion on the part of the railroad company, fairly and honestly directed to secure a substantial compliance with the law of Alabama. Common observation and experience show that building and constructing a railroad for cash in hand is one thing, and that building and constructing a railroad without cash in hand, and for the stock and bonds of the railroad company, which are only expected to be valuable when the railroad shall be completed, and then depending on the earning capacity of the property, is an entirely different thing.

It is proper to say, in addition, that E. F. Browning, the president of the railroad company, testifies that he had never any interest whatever in the Southern Railroad Construction Company, except that after the construction company proved unable, in the depression of 1883–84,

to raise any more money from the sale of bonds, he joined with his brothers in buying from the construction company East & West bonds and stock to provide the construction company in that way with means to complete the road; and that the other two Brownings and West also testify, each for himself, to having originally no connection with the construction company, and no connection at any time, except as an independent buyer of bonds and stock; and that these purchases were made, not for the profit in them, but to help out the construction company in building the new line. And there is no evidence to the contrary; nothing but the inferences to be drawn from extracts of letters written by the parties, mainly to the general manager of the railroad, which are in the main explained and shown by the testimony not to be inconsistent with the direct fact of noninterest in the construction company sworn to by each.

The views taken of the construction contract and the authorities cited apply to a great extent to the contract with the Cherokee Iron Works Company.

That the East & West Railroad Company could lawfully contract with the Cherokee Iron Works, although all the stockholders of the one were also stockholders of the other, in the absence of fraud and misrepresentation, is indisputable; nor would the fact that the two corporations had substantially the same directors, who were the active agents negotiating the contract, render it void,—at worst only voidable, but subject to ratification. *Oil Co.* v. *Marbury*, 91 U. S. 587; *Hotel Co.* v. *Wade*, 97 U. S. 23; *Richardson's Ex'r* v. *Green*, 133 U. S. 43, 10 Sup. Ct. Rep. 280; *Leavenworth County Com'rs* v. *Chicago, R. I. & P. Ry. Co.*, 134 U. S. 707, 10 Sup. Ct. Rep. 708; *Construction Co.* v. *Fitzgerald*, 137 U. S. 110, 11 Sup. Ct. Rep. 36. The contract between the East & West Railroad Company of Alabama and the Cherokee Iron Works was ratified by a unanimous vote of the stockholders of the East & West Railroad Company of Alabama at a meeting where every share of stock was represented. The subscription by the Cherokee Iron Company to the capital stock of the East & West Railroad Company of Alabama, and the lease of the Cherokee Railroad to the same company, and the agreement for the payment of such subscription for said lease in stock and bonds of the defendant railroad company should, under the evidence, be viewed as one contract, and not as several distinct contracts. The contract was made and entered into as one transaction, and took the form of a subscription to be paid in property,—the lease,—and the resolution to pay in bonds and stock; all under the advice of counsel, and apparently in good faith. It can no more be considered a sale for stock than for bonds; in reality it was for both. The original cost for constructing the Cherokee Railroad, with the cost of repairs added by the Cherokee Iron Works, after that company became the owner, exceeded the par value of the stock and bonds fixed as the price to be paid. The net earnings of the property for 1881 were $36,859.51; for 1882, $39,963.41; for 1883, $36,107.50. The weight of the testimony of experts and others acquainted with the property and with railroad values is to

the effect that the Cherokee Railroad was not overvalued. The consideration of $175,000, named in the deed made December 1, 1882, by the Cherokee Iron Company to the Brownings and West is shown to have been fixed with the sole purpose of equalizing interests among stockholders of the iron company, and without regard to the actual value of the property.

As a whole, I find that the transaction was valid; the parties were able to contract, and did contract. There appears to have been no fraud or deceit between the consenting parties, nor any intentional overvaluation, and the consideration was as nearly adequate as could be expected under such circumstances.

If, as I have concluded, the transactions with the Southern Railroad Construction Company and with the Cherokee Iron Works are unimpeachable on the part of complainants, then it follows that the transaction between the East & West Company and the Brownings, by which the debenture bonds were acquired, was entirely just and lawful.

The floating debt of the East & West Company December 1, 1886, was about $300,000. This had been incurred by loss of income, costly repairs made necessary by an unusual flood, and by improvements and purchases, and also by the action of Messrs. Brownings and West in foregoing the payment of interest upon mortgage bonds which they held. As long before as April 21, 1886, the board of directors, with a view to relieving this situation, had directed the calling of a meeting of the stockholders for the purpose of taking steps for the issuance of second mortgage bonds on the company's property and franchises, in an amount not exceeding $300,000, for the purpose of paying the floating indebtedness then and thereafter to exist, and had further resolved that such second mortgage bonds, when so issued, should not be disposed of by the executive committee at less than 65 cents on the dollar. All of the money constituting this debt had been advanced by Messrs. Brownings and West. A stockholders' meeting, called in pursuance of the foregoing resolution, was held June 30, 1886, and by resolution authorized the "issuing by said railroad company of its debenture bonds in the usual form to an amount not exceeding five hundred thousand dollars, * * * to be secured by a mortgage or deed of trust in the usual form." A condition of these obligations, as issued, was that the company should pay, "as interest upon the principal of its bond, such sum, not exceeding six per centum per annum, as shall remain out of the earnings of the company in each year after paying interest on all bonds secured by existing liens upon its property and its operating expenses: * * * providing that, if less than six per centum be paid in any year, even though less be earned, the unpaid interest shall be carried forward, and shall accumulate to the credit of this bond, and no dividend shall be paid upon the stock of the company until all arrears of interest upon this bond, calculating the interest thereon at six per centum per annum from date of issue, shall have been paid."

The precise sum due to the Messrs. Brownings and West for advances up to the time of the delivery of these bonds was upwards of $300,000.

Having this amount due them, Messrs. Brownings and West purchased from the East & West Company $500,000 debenture bonds at 65 cents, the price previously fixed by the board of directors, the aggregate price being $325,000. This sum the purchasers immediately paid in indebtedness of the East & West Company, and in cash.

There remain to consider the charges made in the bill in regard to the dealings of the Brownings and West with Grovesteen & Pell; in substance that, confederating together to dispose of bonds of the East & West Railroad Company of Alabama, they fraudulently procured the listing of the bonds on the New York Stock Exchange, and then by fictitious sales in the exchange procured the bonds to be quoted at a high rate, and thus induced complainants and others, innocent persons, to buy at a much higher figure than the bonds were intrinsically worth.

The case shows that the Brownings and West, the holders of about four fifths of the bonds and securities of the East & West Railroad of Alabama, were, and had been for a long time, anxious to dispose of their interest; that some time prior to February 18, 1887, Edward F. Browning, then president of the East & West Company, was approached by Pell, of Grovesteen & Pell, with reference to a purchase by his firm of the bonds and stock belonging to the Brownings and West. The reason given by Pell for desiring to make the purchase was that his firm already owned or controlled the Rome & Decatur, a parallel road then in process of construction, and desired to own them both. Browning inquired into the standing of the firm, and found it good, and their means reported to be large. Proof of this is found in the fact that six months later they were able to borrow large sums on collateral from Grant Bros., the complainants, and from various persons who are witnesses for complainants, one of whom, W. C. Stokes, testifies that at the time, August, 1887, when he loaned money to Pell, he had known him socially for several years, and knew no reason to doubt his word.

February 18, 1887, a contract was made by and between Grovesteen & Pell, first party, Brownings and West, second party, and the East & West Company, third party. Grovesteen & Pell agreed to build an extension of the railroad, about eight miles long, to a junction with the railroad from Broken Arrow to Eden, in Alabama, to provide not less than 50 new freight cars, and such new locomotives and equipments as might be required for the business of the entire road. The East & West Company agreed that it would make a new consolidated mortgage to secure $15,000 of 6 per cent. bonds for each mile of completed road, "for the purpose of taking up and retiring the present outstanding first mortgage and debenture bonds of the said party of the third part." Of these bonds it would issue to Grovesteen & Pell $150,000 in payment for eight miles of new road, and for the new cars and locomotives, and would also make to Grovesteen & Pell a further payment, in stock, at the rate of $10,000 for each mile of the extension. The Brownings and West agreed that they would "deliver to the American Loan & Trust Company, to carry out the purposes of this agreement," not less than 700 outstanding first mortgage bonds, all of the 500 outstanding debenture bonds, and

v.52f.no.6—35

not less than $750,000 par value of the stock of the East & West Company, "* * * and receive therefor consolidated bonds to be issued by said party of the third part, in exchange, on the basis of one million six hundred and fifty thousand dollars par value consolidated bonds for one million one hundred thousand dollars first mortgage bonds of the said party of the third part, five hundred thousand dollars par value debenture bonds of the said party of the third part, and one million dollars par value of the capital stock of said party of the third part; the basis of the valuation of the said bonds and stock being in the following proportion, namely, said one million one hundred thousand dollars first mortgage bonds, one million dollars cash; said five hundred thousand dollars debenture bonds, two hundred thousand dollars cash; said one million dollars of stock, two hundred thousand dollars cash." Grovesteen & Pell further agreed to buy from the Brownings and West all of the consolidated bonds which they would thus acquire, and also the stock deposited by them with the American Loan & Trust Company, the price of the bonds to be 85 cents for 200, to be paid for at the time of the deposit with the trust company, and a progressively higher price,—about enough to cover interest and all deferred purchases until December 10, 1887, when the transaction must be closed. No additional payment for the stock was contemplated by the contract. Two hundred and fifty thousand dollars in stock was to go with the first lot of bonds. The remaining $500,000 was to remain as security until the contract is fully performed.

In pursuance of this contract Grovesteen & Pell built the contemplated extension of eight miles from Broken Arrow to Eden. They also paid to the Brownings and West, May 16, 1887, $250,000 for 300 consolidated bonds at 85 cents, and received also a bonus in stock as provided by the contract. No other or further transactions under this contract and between the parties are disclosed by the testimony.

It appears, also, that three months later, in August, 1887, Pell borrowed $270,000 in six loans, pledging as collateral $177,000 East & West consols, and $152,000 first mortgage bonds of the Rome & Decatur, a road competitive and substantially parallel to the East & West.

The testimony shows that Pell owned or controlled the Rome & Decatur, and this, as already stated, was his principal reason for the purchase of the control of the East & West Railroad. None of this money was paid to the Brownings and West, or any of them. It appears further that during the months of May, June, July, and August, 1887, Pell several times caused East & West consolidated bonds to be sold for account of his firm, by one broker, and bought for the same account by another, thus causing to be reported and published by the stock exchange, as real, what were in fact fictitious sales, designed to induce the belief that the reported price was in fact the current value of the bonds. The price reported was, however, in no instance any higher than the 110 which Pell had been paying to miscellaneous holders of first mortgage bonds.

The evidence further discloses that E. F. Browning, president, made applications at different times prior to the contract with Grovesteen &

Pell to list the securities of the East & West Railroad in the New York Stock Exchange, which applications contained misrepresentations as to the earnings and operating expenses of the road, and as to the actual physical condition of the same; and after the contract with Grovesteen & Pell, the said Browning made two applications,—one (exact date not given) to list 11,090 shares of the stock of the company, and the other April 14, 1887, to list 1,109 of the first consolidated bonds of the company; which last-mentioned application was granted after numerous examinations, before the committee of the exchange, of Mr. Browning and Mr. Pell, of Grovesteen & Pell, about May 14, 1887. The last-mentioned application, as produced by the stock exchange, contains three serious misstatements of important facts directly relating to the value of the bonds: (1) That of the entire issue of the bonds authorized, 600 were reserved by the railroad company to build extension to Birmingham, Ala., widen gauge, and furnish additional equipment; (2) that the gauge —three feet—was then being changed to standard gauge; (3) that the road was then earning at the rate of $79,000, net, per year over its operating expenses. The facts being that (1) only 150 bonds were reserved, and those were so reserved to carry out the contract with Grovesteen & Pell for extension and equipment, and not to widen the gauge of the road; and (2) the gauge of the road was not being changed to standard gauge, nor had any practical steps been taken therefor; and (3) the road was not earning at the rate of "$79,000, net, per year over its operating expenses," nor any respectable sum over its operating expenses. The statement with regard to the earnings was based upon estimated receipts and doctored reports, with the aid of that lively and sanguine imagination which generally has possession of promoters of railroads and of interested speculators in securities on unfinished railroads.

Mr. Browning testifies that the application produced from the stock exchange is not the one he signed, but corresponds in the above statements with one which Pell prepared for him to sign, but which he refused to sign; that he made numerous changes in the application prepared by Pell, and particularly so as to state that only 160 bonds were reserved for extension and equipment; and, with regard to the gauge, that the company was proposing to change the same to standard gauge; that, after the corrections were made, the whole was copied on a typewriter of the American Loan & Trust Company, signed by him, and given to Pell; that the application produced contains only the last page of the application copied on the typewriter of the American Loan & Trust Company, and signed by him, the first three pages being substituted; that the substitution is shown by indications as to the removal of brass tags, and the fact that the first three pages are typewritten on a different typewriter from the last page. The application has been retained by the master, and is now in the record. An examination shows that the first three pages are typewritten on a different typewriter from the last page, the first three being apparently the production of the "Caligraph," and the last of a "Remington;" and the marks at the top show that originally tags or brass fasteners were used to hold the pages together, which have since been removed and a pin substituted.

On the other hand, however, the application to list the stock, made about the same time, which is not disputed by Browning, contains two of the statements in question: (1) That the gauge is now being changed to standard; and (2) "the road is now earning $79,000, net, per year over its operating expenses." And it further appears that, on the application to list the bonds actually filed with the stock exchange, Mr. Browning appeared twice in support of the application, and was examined at length with reference to the matters contained therein, and it would seem that if there had been a substitution, as is claimed by Browning, it would then have been noticed either by him or by the committee. There is some testimony tending to show that E. F. Browning, after the contract with Grovesteen & Pell, and after he had vacated the presidency in favor of Pell, continued to be intimate with Pell, visiting him at his office every day up to Pell's disastrous failure, and during the time that the fictitious sales were being made in the stock exchange. Also, that E. F. Browning was on the finance committee of the American Loan & Trust Company, which was loaning money on East & West Railroad securities, and was necessarily acquainted with the quotations on the exchange of the first consolidated bonds of the East & West Railroad Company, and thus they knew that they were selling at rates largely over their value, and was a party to the deceit, which it is claimed was for the benefit of the bonds still owned by the Brownings and West.

All this, however, is denied by Browning, who swears that he went to see Pell four or five times in relation to the terms of the contract afterwards perfected, and not again until a short time before Pell's failure, when he gave Pell, to sell for his account, some El Cristo mining stock, which being sold, he visited Pell's office to collect his money, and was compelled to return from day to day for the same. That at these visits he had nothing whatever to say about the railroad, except to pass the remark as to how it was getting along, etc. That he had no knowledge whatever that Pell was selling East & West Railroad bonds, and has no interest therein, and was absolutely ignorant of and disconnected with such transactions. That he sold no bonds of his own otherwise than in the Pell contract, and authorized no sale.

The complainants contend, on the aforesaid showing, that the Brownings and West, in conjunction with Pell, grossly misrepresented the value of its property and its condition; the gauge of the road and the number of bonds which would be outstanding; and by these means innocent parties were induced to buy these bonds; and further, that, under the contract between the Brownings and Grovesteen & Pell, Grovesteen & Pell were really the agents of the Brownings to market these bonds.

Six witnesses testify as to the representations on which it is claimed innocent parties purchased the bonds in question, and their evidence is substantially as follows:

Frederick Grant, complainant, sworn:

"We hold thirty thousand dollars of those bonds. We made the loan in the board the 16th day of August, 1887, through Donald, Gordon & Co. My brother happened to be away at the time, and we made the loan in the board, —thirty thousand dollars,—and Mr. Pell himself came in with that loan.

He merely brought in thirty thousand dollars of the East & West Alabama and six of the Rome & Decatur. The bonds were brought in by Mr. Pell. I was not familiar with the prices, and I therefore looked at the printed list, and saw that one hundred nine and a quarter was bid for the bonds. *Question.* Have you the list that you looked at? *Answer.* Yes, sir; I have it here,—the very list; and I told my cashier to draw the check while Mr. Pell waited there; and he gave him a check for thirty thousand dollars. And I looked over the bonds, and they seemed to be all right. That gave us a margin of considerable over twenty per cent., which is our usual margin in making loans of that kind,—in making loans on the stock exchange. The bonds had been selling on the market at about that price, so I was told afterwards. *Q.* What, if any, information did you have as to the nature, character, and consideration of those East & West Railroad bonds before or at the time you made this loan? *A.* Well, I can answer that in a very few words: That we were simply governed by the quotation. As I said, I looked at this list; I knew it was a new bond. And there were sales made before we made the loan on these bonds, and the question came up when the concern failed whether any such *bona fide* sales had ever been made; and it was merely what they termed in the stock exchange as a ' washed sale,' and that misled us, as it did a great many others, regarding the price of those bonds."

Richard L. Edwards, president of the Bank of the State of New York, testifies:

"*Question.* I will ask you to give a statement of the history of how he came to the bank, and everything that transpired between you and him in connection with the securities of the East & West Railroad Company, and with your accepting the same for any loan made by Mr. Pell by your bank. *Answer.* Some time previous, I don't remember how long, probably over a month, just before that time, he had frequently made application to the bank for loans of $25,000, or sometimes $50,000, on dividend paying securities, and he mentioned the East & West Railroad of Alabama bonds,—the first mortgage bonds. He called attention to the market price, and was generally refused on the ground that we did not know anything about the bonds. Sometimes he would come in close on to three o'clock, and beg pretty hard for $25,-000 just overnight, and I loaned him $25,000, I think, on about thirty or fifty of the bonds. It remained three or four days, and I submitted the loan to the board at a board meeting, and I asked the question of the board, —of the various parties whom I thought ought to know something about these securities,—but they did not appear to know, and so I called the loan, and refused to lend him, on applications made subsequently, at all on those bonds. After this loan was called, a subsequent application by Pell on this loan, on the same securities, was refused repeatedly; and he then told me he was negotiating for the sale of all the bonds through an English syndicate,— the price was $107\frac{1}{2}$,—and he hoped to consummate it within a few days. No application was made for a further loan for some days. He wanted to open an account with the bank, and I refused him. I told him, no; he could not open an account with the bank. In a day or two afterwards he came back, and said he felt very much grieved at my refusal to open an account with him. I had known him some time, and he wanted to know if I would give him my reasons. I told him, 'Yes; you are dealing in a class of securities I don't know much about, and I don't propose to loan you money on them,' and therefore I didn't think it would be very agreeable to either party, and not to his advantage. That ended that matter, but, probably a week or so after that, he came in and told me that he had sold all the bonds of the East & West Railroad Company of Alabama at $107\frac{1}{2}$ to an English

syndicate; that he was president of the road, and wanted to open an account; didn't want to borrow any money on the bonds, and he could keep from $50,000 to $100,000 in money on deposit; Drexel, Morgan & Co. it was arranged through, and he wanted to know if I wouldn't open an account with him. I questioned him at length about the sale of the bonds, etc., and he stated positively—he stated so to the cashier—that he had sold all the bonds, and he was out of the woods, and he had made ever so much money; I have forgotten the amount he mentioned. I turned around to the cashier, and asked him to hear the same story from Mr. Pell, and, if he thought advisable, to take his signature. He did so; he took his signature. He was to keep thirty thousand dollars to forty thousand dollars on deposit, and, after he opened his acccount, nearly all his operations were confined to shifting those bonds for loans; you could tell that from the checks that came in; and he finally came to me. So, in watching the account, I noticed that there were loans paid off, and I sent for him and told him that I could not afford to take up these bonds, and asked him if he had to borrow money on them; otherwise he might find himself close on to three o'clock without those bonds and no money. 'Oh, no,' he said, he would 'take care of that.' So I stopped his certification several times until he made deposits from the loans he had made to other parties. In one instance he made a $50,000 loan of L. Hoffman & Co. against his signature account. Then some days after that he told me he was ready to deliver those bonds to Drexel, Morgan & Co.; that he had to take up his loans around the street; and he wanted to make an arrangement for the certification of his checks to take up the loans and deliver the bonds to Drexel, Morgan & Co. He said there were over 500,000 of them; about 500,000 of them he wanted to deliver. I said: 'Pell, you had better go slow. Take 100,000, and deliver that amount on the account.' In order to get one hundred thousand of the bonds, he had so many of the Rome & Decaturs mixed up with his loans that he checked off 180,000; I think it was one hundred and eighty. It was in different checks. The idea was to take 100,000 East & West, and deliver to Drexel, Morgan & Co. at 107½ on account of his sale through them to this English syndicate. When three o'clock arrived, he came down with 131,000 Rome & Decatur bonds and 84 East & West, stating that there was some misunderstanding with Drexel, Morgan & Co., it having been intended that these bonds should not go through until the following Wednesday, I think it was, possibly Thursday or Friday. On the following Wednesday he was to take up the bonds, and deliver the bonds to Drexel, Morgan & Co., and he came back with the story that Drexel or Morgan, I don't remember which, had gone off on his yacht, and would not be back for ten days, and nobody knew anything about it at Drexel, Morgan & Co.'s. Well, of course, that exposed the whole piece of rascality, and I shut right down on him, and he failed. He closed up, and I had to take the bonds, and work out of them as well as I could. The bonds and stock and ten shares of the American Loan & Trust Company's stock he also brought down with the other securities. So that is the reason I call it a 'forced loan.'"

S. A. Shephard, called and sworn for the complainants:

"*Question.* Mr. Shephard, are you or not connected with the Bank of Montreal? If so, in what way, and how long have you been so connected? *Answer.* I have been connected with the Bank of Montreal for nineteen years; thirteen years in New York. *Q.* In what position? *A.* As third officer of the bank here. *Q.* Were you so connected with them in July and August, 1887? *A.* I was. *Q.* Did you or your bank have any transactions with Grovesteen & Pell during those times? *A.* Yes, sir. *Q.* Please state whether your bank is now the holder or owner of any bonds of the East & West Rail-

road; if so, how many. *A.* The bonds are not held by the bank. *Q.* Who are they held by? *A.* In my name. *Q.* From what did you acquire them? *A.* They were sold on the exchange. *Q.* Sold by whom? *A.* By a regular broker. *Q.* As whose bonds were they sold? *A.* The Bank of Montreal. *Q.* State how the Bank of Montreal, if you know, became possessed of these bonds? *A.* Made a loan to Grovesteen & Pell. *Q.* When? * * * *A.* About June; just before they failed; a few days before they failed. *Q.* Mr. Shephard, I will get you to state which member of the firm made or transacted the loan. *A.* Mr. Pell. *Q.* State whether or not Mr. Pell said anything in regard to those bonds, or their value or price, at the time loan was made. *A.* Well, I can't remember on that special transaction; but he was continuously borrowing money from the bank. *Q.* Well, state whether Mr. Pell said anything during the time that he was carrying on the transaction with the bank in regard to the character of the bonds,—their price. *A.* Mr. Pell several times pointed out to me the price of these bonds on the stock exchange list,—they were selling at a certain price; and he did that more than once, I am very certain. The bonds were traded in the stock exchange; sold at a certain price, and bought. *Q.* Do you remember what those quotations were, so pointed out to you? *A.* They were 109, I think, so far as I can remember. *Q.* Did he say anything about whether the bond was a good bond, or anything of that kind? *A.* Well, a bond that is selling at 109 is always supposed to be a good bond. *Q.* Did Mr. Pell pay his indebtedness to the Bank of Montreal from which these ones were taken? *A.* No; he did not. *Q.* The bank sold the bonds for the debt? *A.* Yes, sir."

Walter C. Stokes, called and sworn for the complainants, testified as follows:

"I loaned the money in the board to Grovesteen at a quarter before three. The loan was brought in by Mr. Pell. He, after bringing the loan into the office, came around into the customers' office, where I was, and, while waiting for his check, passed some conversation. My cashier sent for me, and asked me if I wanted to make the loan on these securities. He said, 'I wouldn't do it.' * * * I looked at the securities, and said, 'I don't recognize them.' I had been away for a long time, and I says, 'I will have to see what Pell says,' and I went to Pell and asked him. I told him my cashier objected to making the loan. I didn't know the securities. He said, 'What do you want to know about them?' and I asked him whether they were the first mortgage on the road, and he said they were. I asked him whether they paid their interest, and he said, 'Yes.' Then I asked him,—still hesitating to make the loan,—I asked him whether they were listed, and he said, 'Certainly, they were;' and he reached over and touched the tape of the machine, and said, 'Six of them were sold to-day at 109 or 109½,'—I am not clear which; I think he said 109. I knew it was late, and he was very warm. I didn't want to make the loan, but I had known Pell socially for several years, and had no reason to doubt his veracity in any way. I didn't think very much of the strength of the house, because there had been some rumors about their condition which would have made me nervous about making the loan. I said, 'Do you know about those bonds?' and he said, 'You bet your sweet life I do.' I said, 'Do you consider them perfectly good,' and he said, 'I know they are.' It was ten minutes of three, and the perspiration was coming from every pore in his face. I felt that I didn't want to make the loan, but I went back to the cashier, and told him to draw check for him. I says, 'Pell says he knows all about them, and they are the first mortgage bonds, and I don't see how I can lose much on them. At any rate, call that loan at half past nine to-morrow morning, and give him a check.' That was done, and the next morning the loan was called, and I sent over from the exchange

about half past ten o'clock to know whether it had been taken up. It had not. I went over again at 11 o'clock, and it had not been taken up. I sent down to hurry it up, and word came back that it was all right, they would hurry it up. I waited until 12 or 12:30, and no return, and I went down myself, and could not find either Grovesteen or Pell; I found the cashier, though, and he said they would attend to it. Then I waited for an hour, until I found Grovesteen, and he told me that it was all right, that we could not lose a cent, and he would see it was taken up. I went back to my office, and put him on notice if it was not taken up until half-past one or two, I would proceed to sell him out under the rule. * * * I proceeded to sell them out under the rule, and they were offered by the chairman from 109 down on the fraction until they got down near par, and then down to one per cent., and from that on down to 65, without bringing forth a single bid, and then, not wanting to sacrifice the property, I withdrew them."

Maximillian Herschel, called and sworn for the complainants:

"I had some money to loan at that time, and, as I was not a member of the New York Stock Exchange, I requested the firm of E. C. Humbert & Co. to loan for me some money in the New York Stock Exchange. Well, they reported to me that they had loaned out the money to Grovesteen & Pell, about —I don't know exactly, but I suppose between 12 and 2 anyhow. I was in E. C. Humbert's office, and a boy came in and handed in to the cashier some bonds in an envelope, and asked for a check for the same. Well, the cashier handed to me the bonds to see whether they were satisfactory to me, and I looked over the bonds, and said: 'I don't know anything about these bonds. I never heard of them. I don't want them.' So the cashier handed the bonds back to the boy, who was in there to get the check, and told him to go to Grovesteen & Pell, and ask them to send in some other collateral. Then, after a while, a short time after the boy had left, Pell came in, and he acted as if he was angry, and he said, 'What's the matter with these bonds? Ain't they good collateral?' 'Well,' I says, 'they may be good collateral. I don't know anything about them. I never heard of them.' 'Well,' he says, 'they are good bonds.' 'Well,' I says, 'they may be good bonds. You may consider them good bonds; but I make it a rule never to loan money on anything that is not quoted in the stock exchange, anyhow.' 'Well,' he said, 'if that is the case, they are quoted regularly in the New York Stock Exchange, and transactions take place in them regularly.' While saying so, he took hold of the bond list, and also of the sales list, and pointed out to me where they were regularly quoted, and what transactions had taken place. He says, 'There they are. They are selling,' I believe he said, 'about 107 or 108 or 109.' And he said, 'Besides that, everybody is taking them. I have borrowed money on them of several banks and brokers; and not only this,' he says, 'but they have been negotiated on the other side by a syndicate headed by Drexel, Morgan & Co.' So, on these statements, I let him have the money, of course, to my sorrow."

Sylvester Post, called and sworn for the complainants:

"*Question.* I will get you to state whether the firm of Hutchinson Bros. at that time had any dealings with Messrs. Grovesteen & Pell. *Answer.* They made a loan to them of $25,000 the day prior to their failure. *Q.* Did you receive any security for the loan? if so, what? *A.* We received $25,000 East & West. We received $25,000 East & West Alabama firsts and five Rome & Decatur firsts. *Q.* Did you have a conversation with any member of that firm in regard to that loan on that day? *A.* With Mr. Pell. *Q.* Please state what it was. *A.* He entered our office a few minutes before three with a loan for $25,000, and I told him I didn't like the securities; we had a loan prior to

that, and I objected to them at that time; and he said those bonds were regularly listed on the exchange; there were daily sales of them; and he called my attention to the bond list. I referred to that, and found that they were; I think 109 bought; I could not say definitely; sales about nine to ten; several bonds had four to six bonds, or something like that; and he said they were a perfectly good bond. I told him I rather doubted it, as the price indicated they were not a strictly first-class bond. First-class bonds at that time were at a higher price. *Q.* Did he make any reply to that? *A.* No, further than saying they were as good as anything on the list. *Q.* Did your firm do anything to reduce these bonds to ownership after the failure of Grovesteen & Pell? *A.* We brought suit through John L. Branch, 120 Broadway. Mr. Blair, of Blair & Rudd, was appointed referee in the case, and the bonds were closed out at auction. *Q.* And by whom bought? *A.* We bought them in to protect ourselves."

The foregoing evidence—and no other witnesses were examined on the subject—is not sufficient to show that the complainants, or any person similarly situated, bought the first consolidated bonds of the East & West Railroad of Alabama on any representations the Brownings had made, either to list the bonds or otherwise. On the contrary, it tends to show that all the complaining parties became the holders of those bonds either on the standing and representations of Pell, or through their reliance upon the quotations that were made of said bonds in the New York Stock Exchange, produced by the fictitious sales manipulated by Pell, or both. It is true two of the witnesses testified that, if the bonds had not been listed, they would not have dealt in them. This falls far short of proving that they purchased the bonds for the reason that they were listed, or because of any representations made by any person to procure the listing. The common-sense fact is, and will appear from an inspection of any list of quotations upon the New York Stock Exchange, that the mere listing of securities on the New York Stock Exchange is no criterion whatever as to the value of such securities; and common experience teaches that the listing of securities on the New York Stock Exchange is not a first-class test even as to the genuineness of such securities. At all events, the evidence does not satisfy me that the complainant acquired the bonds because they were listed on the New York Stock Exchange, and it was only in representations, which may have led to such listing, that the Brownings were concerned. In this connection it may also be noticed that not one of the complaining parties who have testified is shown to have acquired the bonds in controversy at the prices quoted in the New York Stock Exchange, or even at or near par value, but practically at about the prices fixed in the Grovesteen & Pell contract. The contract between the Brownings and Grovesteen & Pell cannot be properly construed to mean other than a contract of sale by the Brownings to Grovesteen & Pell, and I am wholly unable to construe it to be a procuration constituting Grovesteen & Pell agents for the Brownings to market bonds.

The view that I have taken of the several points in the case renders it unnecessary to pass upon several other important questions presented in

the pleadings and proofs, among others, to wit, that the bill of Grant Bros. is defective for want of necessary parties; that it is without equity, because the complainants have a complete and adequate remedy at law; and the estoppel claim in favor of Kelly & Byrne, (purchasers of the Brownings and West,) by reason of the negotiations had between the bondholders (complainants participating) and the Brownings and West, and the reorganization contract resulting therefrom March 22, 1888.

In the voluminous record and brief submitted in this case, there may be minor points in favor of complainants that have escaped my attention, but the conclusions reached on the salient points are such it necessarily follows that complainants have failed to establish a case entitling them to equitable relief in the present proceeding.

*Schley's Case.* Schley's position in this case since the order of consolidation is that of an intervener. The litigation in his behalf was commenced by filing a bill in 1888 against the East & West Railroad Company of Alabama, the American Loan & Trust Company, trustee, and other persons, setting out that he was a judgment creditor of the railway company, that his judgment was unsatisfied, and the railway company insolvent, praying for a receiver, and that the earnings of the railway be sequestrated and applied to the satisfaction of his said judgment. He also set forth the general mortgage given by the East & West Railroad Company to secure its first consolidated bonds; prayed that the same be foreclosed for the benefit of his judgment, and the bonds secured thereby, except certain bonds that were alleged to have been illegally and fraudulently issued; and he prayed for an account of the bonded indebtedness of the railroad company, and general relief.

A full statement of the case and of the preliminary proceedings will be found reported in the case of *American Loan & Trust Co.* v. *East & W. R. Co. of Alabama,* 37 Fed. Rep. 242, wherein the pleas of Schley to the main bill, and the demurrer of the American Loan & Trust Company to Schley's bill, denying jurisdiction, were overruled. Thereafter, the case as to Schley was fully put at issue. By stipulation of counsel, all the testimony, relevant and material in this intervention of Schley, taken in the main case or in the case of Grant Bros., may be considered here.

The answer of defendant trustee contains a demurrer to Schley's bill for want of equity; and the answer also charges that his judgment is collusive, and not based on real indebtedness of the East & West Railroad Company. I am not disposed, however, to pass upon these and other objections of a technical nature, as the case can be more satisfactorily disposed of upon the merits.

As to the general proposition that Schley, as a judgment creditor, filing a creditor's bill, and procuring an appointment of a receiver thereunder, was entitled to have the net earnings of the railroad company, from the time that his receiver was appointed up to the substitution of a receiver in the interest of the trustee under the bill of foreclosure, applied in reduction of his judgment, it only needs to be noticed that in an in-

quiry heretofore had, provoked by Schley on reference to, and report of, the special master, it was found that there were no net earnings during the period in question.

On this hearing Schley contends (1) that the $500,000 of debenture bonds issued by the East & West Railroad Company were illegal and invalid, and that their exchange into first consolidated mortgage bonds was also invalid; (2) that the first consolidated mortgage and the bonds issued thereunder are invalid, because of the informalities and irregularites in complying with the laws of the state of Alabama in relation to increase of indebtedness of corporations; (3) that the American Loan' & Trust Company, as trustee, fraudulently issued $75,000 of bonds to Grovesteen & Pell prior to the time when the same had been earned by said Grovesteen & Pell under the terms of the contract and the requirements of the mortgage, and that the said trust company now holds 50 of the first consolidated mortgage bonds, which should be applied to the payment of Schley's judgment, or postponed until his judgment is satisfied.

1. The debenture bonds having been exchanged for new bonds, and the debenture mortgage having been satisfied of record, the irregularities attending the issue of the bonds, and the granting of the mortgage, are now immaterial; the debenture bonds were never void, but represented, beyond contest, a sufficient indebtedness to operate a good and sufficient consideration for the new bonds issued in lieu thereof.

2. The informalities and irregularities alleged against the issuance of the first consolidated mortgage bonds are (1) that such mortgage was authorized by a meeting of the stockholders held out of the state of Alabama; (2) that no notice of such meeting was given, as required by law, to increase the indebtedness; and (3) that no report of the stockholders' meeting was made or filed in the office of the secretary of state of Alabama, as required by law.

The evidence shows that a meeting of the stockholders was called to meet at the office of the company at the town of Cross Plains, Ala., on the 20th day of April, 1887, for the purpose of providing funds for the extension and completion of the road, to widen its gauge, and to take up and retire the outstanding mortgage bonds and debenture bonds; and that prior to that date every stockholder consented in writing to the issue of the first consolidated mortgage bonds, and to the granting of the mortgage to secure the same for all the purposes aforesaid, except to widen the gauge; that on March 25, 1887, at a meeting of the board of directors, apparently held at Cedartown, in the state of Georgia, but actually held, according to the testimony of President Browning, at the town of Cross Plains, Ala., the aforesaid call of a stockholders' meeting and the unanimous consent of the stockholders were recited, and resolutions authorizing the issuing of the first consolidated mortgage bonds for the purposes aforesaid were duly passed; and that a report of the directors' meeting reciting the stockholders' consent, duly certified, was filed in the office of the secretary of state of the state of Alabama, on the

22d of October, 1887, prior to Schley's suit against the railroad company.

On this state of facts the law of Alabama was sufficiently complied with. The whole transaction seems to have been valid between competent contracting parties antecedent to Schley's becoming a creditor of the railroad company, and Schley cannot be heard at this time to question the matter, unless he aver and prove that it was a part of a scheme to defraud subsequent creditors. *Porter* v. *Steel Co.*, 120 U. S. 671, 7 Sup. Ct. Rep. 1206.

This last aspect of the case has been sufficiently considered, and determined adversely to Schley's contention, in disposing of Grant Bros.' case.

3. The contract of Schley, upon which his judgment was based, was made with Grovesteen & Pell for the building and construction of the extension from Broken Arrow, and he was to be paid therefor monthly upon statements furnished by the engineer selected by the parties, except that 20 per cent. of the amount due upon each payment was to be reserved until the completion of the entire contract. His contract was entirely with Grovesteen & Pell, contained no agreement to satisfy Schley's demands in bonds of the railway company, and gave Schley no lien whatever on any bonds which might be issued by the railroad company to Grovesteen & Pell for building the road. He had no contract whatever with the railroad company, and the judgment he finally obtained against the railroad company was for money only, without recognition of any lien; in fact, no lien of any kind was claimed in the suit.

The contract of the railroad company with Grovesteen & Pell for construction provided as follows:

"Payments to the party of the first part for the construction of the extension from Broken Arrow to Eden, Alabama, and of the equipment hereinbefore mentioned, of the one hundred and fifty thousand dollars par value of said consolidated bonds and stock, at the rate of ten thousand dollars per mile of said extension, shall be made by the said trustee in the following manner: On presentation of bill of lading for shipment to the parties of the third part of at least five hundred tons of steel rail, seventy-five thousand dollars par value of said consolidated bonds, and upon the certificate of the engineer in charge and of the general manager of said party of the third part that the work has been performed and equipment furnished in accordance with the terms of this agreement, the remaining seventy-five thousand dollars par value of said consolidated bonds, and also said stock at the rate of ten thousand dollars par value per mile."

The mortgage securing the first consolidated bonds provides:

"But such bonds, or any of them, shall be issued by the trustee only upon the written order or demand of the president of the said railroad company, accompanied by the certificate of its chief engineer that part or parts of said railroad, in respect to which said bonds are demanded, has, or have, at the date of said certificate, been so completed as to be ready for the regular and continuous running of trains, which certificate shall clearly state the points or places from and to which the said railroad shall have been so completed, and the precise length of the entire completed portion in miles, which order and certificate may be accepted by the trustee as sufficient evidence of its authority to issue said bonds as aforesaid."

It appears from the evidence that the bonds for $75,000 for construction, under the contract with Grovesteen & Pell, were issued about August 16, 1887, on the following certificates:

"EAST & WEST RAILROAD COMPANY OF ALABAMA,
"NEW YORK, August 16th, 1887.

" *W. D. Snow, Esq., Secretary American Loan & Trust Company*—DEAR SIR: We beg to notify you that the extension of the East & West Railroad Company of Alabama from Broken Arrow to Pell City, the junction point with the Georgia Pacific Railroad, is completed, making in all one hundred and twenty miles of road.                 Very respectfully,
  "S. A. CRUIKSHANK, Sec'y.              GEO. H. PELL, Pres't."

"CARTERSVILLE, GA., Aug. 16th, 1887.

"*To W. D. Snow, Secretary American Loan & Trust Company*, 115 *Broadway, New York:* The completion of the East & West Railroad to the Georgia Pacific Railroad at Pell City, on Monday, the 15th of August, gives that road now one hundred and twenty miles of track.
                    "JOHN POSTELL, V. P. and G. M."

"OFFICE OF EAST & WEST RAILROAD OF ALABAMA,
"NEW YORK, Aug. 16th, 1887.

" *W. D. Snow, Esq., Secretary American Loan & Trust Company*—DEAR SIR: I desire to inform you that John Postell is acting chief engineer of the East & West Railroad of Alabama.
  "Very respectfully,              GEO. H. PELL, President."

John Postell, being examined in behalf of Schley, testifies that he was the chief engineer and general manager of the East & West Railroad Company of Alabama in the spring, summer, and fall of 1887, and gave the foregoing certificates as to the completion of the East & West Railroad to the Georgia Pacific Railroad at Pell City, on Monday, the 15th of August, 1887. On being asked whether, at the time he gave that certificate, that portion of the East & West Railroad of Alabama from Broken Arrow to Pell City had been completed, and was ready for the regular and continuous running of trains thereon, answered:

"Yes, sir; I considered practically that it was. *Question.* And the connection had been made? *A.* Yes, sir. *Q.* Isn't that about as soon as it was completed? *A.* I think we had connected, running trains the next day. *Q.* Isn't it a fact that the trains did not begin to run regularly on that portion of the road—regularly and continuously, now—until late in the fall of 1887? *A.* Well, it is a matter of memory with me; the schedule will show; I can't remember now whether it is so or not. *Q.* Mr. Postell, isn't it a fact that Mr. Schley, the contractor for the extension of that road, continued to work on that road, and did do work on that road after the date of the certificate, in its construction? *A.* Well, as I stated just now, the road was completed very hurriedly to make connection, in order to get the business started; and I authorized Mr. Schley to leave out a few of the ties, so as we could make the connection, and then we could put them in easier afterwards with the trains on the road, as the ties were at a distance, and had to be hauled in wagons, and it delayed the finishing of the road a week or two; and then he finished putting in the ties; perhaps he was a week or more putting them in; the road, though, was practically finished, except putting in those ties. It facilitated the work."

The first time that Schley made any claim against the railroad company for construction seems to have been September 6, 1887, when he obtained a certificate from the auditor of the company stating that the balance due him on that date on construction of the East & West extension, according to the final estimate by the engineer, was $13,431.72. The record also shows an account made out against the railroad company dated August 26, 1887, for the amount of said indebtedness, sworn to by Schley on October 21, 1887, as due from the company, with interest at the legal rate from August 26, 1887. His suit was instituted in the circuit court of Cherokee county, Ala., against the company on November 11, 1887, and his judgment was obtained at the same term on December 16, 1887. It is thus seen that, at the time the certificates were given on which the bonds were issued to Grovesteen & Pell for the extension, Schley's claim for indebtedness against the company for and on account of such construction was not in existence; or, if in existence, not made known to the company, or to the trustee under the mortgage.

I find no record in the evidence tending to show that the trustee, in issuing the bonds upon the certificates aforesaid, acted otherwise than in good faith. It would seem that, although the certificates were not in the exact form required by the mortgage, and by the contract with Grovesteen & Pell, it was, in the absence of fraud, competent for the parties in interest to waive informalities, and, as the road was practically completed at the time the certificates were made and the bonds issued, no injury could or did result to any parties by reason of waiving the formal certificate required by the contract. At least, it is difficult to see how the transaction resulted in any wise to the injury of intervener, Schley. The evidence shows that the certificates were made and the bonds issued prior to the failure of Grovesteen & Pell, and there is a very strong inference arising from the showing of Schley in this case that his claim against the company for the amount due him on construction did not arise until after the failure of Grovesteen & Pell, which was about August 24, 1887.

The evidence shows that the American Loan & Trust Company is now a holder of 50 of the first consolidated mortgage bonds of the East & West Railroad Company, but it is not very full as to the manner in which the company acquired the bonds. Enough, however, appears to show that, when the 75 bonds were issued on the certificate of August 16th, they were retained by the trust company for account of Pell to secure advances and loans made to him at and prior to that date; that afterwards Pell directed the trust company to turn over 25 bonds to John Postell in settlement of a suit which Postell had brought against the railroad company and others; and that, on the 24th day of August, Postell receipted for 25 of the said bonds, although, in fact, he received but 18. It appears that on presentation of his order the trust company demurred to delivering the bonds called for, claiming that it held them as collateral security for advances made to Pell, but some sort of a compromise was effected by which it did surrender 18, taking a re-

ceipt for 25. The testimony of O. D. Baldwin, president of the American Loan & Trust Company, is to the effect that the trust company now holds 50 of the said bonds, and they now stand on the books of the company at $33,000, but the actual cost of the same is upwards of $50,000. Since the institution of this suit, the American Loan & Trust Company, having failed, has been removed as trustee, and the present complainant George S. Coe substituted, so that now the American Loan & Trust Company has no further interest in this suit than as the holder of the aforesaid 50 bonds. It is very doubtful whether intervener, Schley, in this litigation can maintain a claim against the holder of bonds who is not a party to the suit, for the purpose of appropriating any portion of the bonds or postponing the payment of them beyond others of the same issue. On the evidence, however, it does not appear that he has established any claim against the said bonds for which the court could give him relief, even were the proper parties before the court.

All that can be done for the intervener, Schley, in this case, seems to be to recognize his judgment as a valid judgment against the East & West Railroad Company, but inferior as a lien to that of the bondholders under the first consolidated mortgage, the foreclosing of which is sought in the present suit.

*On the Main Case.* The evidence establishes the granting of the mortgage, the foreclosure of which is sought; the issuance of 1,750 bonds, each for $1,000 thereunder, dated December 1, 1886, payable to the American Loan & Trust Company or bearer, December 1, 1926, in gold coin, at the office of the American Loan & Trust Company, in the city of New York, together with interest thereon at the rate of 6 per cent. per annum in like gold coin, payable in June and December of each successive year until maturity, on presentation and surrender of the coupons attached to said bonds; that the said East & West Railroad Company has made default in the payment of the interest coupons, maturing on December 1, 1887, and on all coupons maturing thereafter; that the said default has not been waived; and that the trustee has declared, in accordance with the terms of said mortgage, the principal secured by said mortgage to be due and payable.

The complainant is, therefore, entitled to a recognition of the lien under the mortgage, and a decree of foreclosure as prayed for.

It appearing, however, that, since the institution of the suit and the appointment of the receiver, the receiver, under authority from the court, and with consent of parties, has issued and sold certificates to the amount of $650,000, payable on or before April 1, 1894, and drawing interest at the rate of 8 per cent., which receiver's certificates are by order of court and consent of the parties a first lien upon all the property and franchises of the said railroad, it follows that the decree of foreclosure must recognize the lien and priority of said receiver's certificates.

The accompanying decree will be entered in the case.